# 23-0184-cv

## United States Court of Appeals

*for the*

## Second Circuit

———————————◆———————————

LOUIS OBERLANDER, on behalf of himself and all others similarly situated,
CHRISTOPHER UNDERWOOD, on behalf of himself and all others similarly
situated, HENRY RODRIGUEZ,

*Plaintiffs-Appellants,*

ZENEYDA PATIN, on behalf of themselves and all others similarly situated,

*Plaintiff,*

— v. —

COINBASE GLOBAL INC., COINBASE, INC., BRIAN ARMSTRONG,

*Defendants-Appellees.*

———————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR
PLAINTIFFS-APPELLANTS

JORDAN A. GOLDSTEIN
SELENDY GAY ELSBERG PLLC
1290 Avenue of the Americas,
17ᵗʰ Floor
New York, New York 10104
(212) 390-9000

STEVEN L. BLOCH
SILVER GOLUB & TEITELL LLP
One Landmark Square, 15ᵗʰ Floor
Stamford, Connecticut 06901
(203) 325-4491

*Attorneys for Plaintiffs-Appellants*

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................1

STATEMENT OF JURISDICTION.........................................................2

STATEMENT OF ISSUES ........................................................................3

STATEMENT OF THE CASE....................................................................5

    A.    Digital Assets, Coinbase, and Crypto-Securities ................................5

    B.    Losses Incurred by Appellants ........................................................7

    C.    Procedural History ............................................................................8

    D.    The Decision Below .......................................................................11

SUMMARY OF ARGUMENT ..................................................................13

ARGUMENT ............................................................................................16

I.    The District Court Erred By Failing To Give Effect To Appellants' Filing Of An Amended Complaint After Their Appointment As Lead Plaintiffs..................................................................................................16

    A.    An Amended Complaint Supersedes Prior Complaints, Including Any Prior Allegations That Purportedly Contradict The Amended Complaint ....................................................................16

    B.    The Private Securities Litigation Reform Act Requires Courts To Give Effect To Amended Complaints Filed By Appointed Lead Plaintiffs .....................................................................................26

    C.    The District Court's Reliance On Superseded Allegations Is Especially Improper As To Appellant Rodriguez, Who *Never Joined* The Prior Allegations On Which The District Court Relied..................................................................................................30

II.    The District Court Erred By Relying On The December 2021 Coinbase User Agreement ..............................................................................36

A.     No Version Of The Coinbase User Agreement Was Before The District Court On The Motion To Dismiss ..........................................36

B.     Appellants Never Accepted The December 2021 Coinbase User Agreement On Which The District Court Relied...............................42

C.     The District Court's Reliance On The Coinbase User Agreement Effectively Turns That Agreement Into An Illegal Waiver Of Securities Claims.................................................................46

III.    Appellants Plead Violations of Federal and State Securities Laws .............48

A.     Appellants Plead a Claim Under Section 12(a)(1).............................48

B.     Appellants Plead A Claim Under Section 29(b) .................................53

C.     Appellants Plead Claims For Controlling Person Liability ...............56

D.     Appellants Plead Claims Under the Securities Laws of California, Florida, and New Jersey.....................................................57

CONCLUSION ..........................................................................................................59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*188 LLC v. Trinity Industries, Inc.*,
    300 F.3d 730 (7th Cir. 2002) ...................................................................19

*AEI Life LLC v. Lincoln Benefit Life Co.*,
    892 F.3d 126 (2d Cir. 2018) ...................................................................40

*Alessi Equip., Inc. v. Am. Piledriving Equip., Inc.*,
    578 F. Supp. 3d 467 (S.D.N.Y. 2022) ...................................................55

*Amalgamated Sugar Co. v. NL Indus., Inc.*,
    825 F.2d 634 (2d Cir. 1987) ...................................................................24

*Anderson v. Farmers' Loan & Tr. Co.*,
    241 F. 322 (2d Cir. 1917) ......................................................................50

*Andrews v. Metro N. Commuter R. Co.*,
    882 F.2d 705 (2d Cir. 1989) ...................................................................30

*In re Atlas Van Lines, Inc.*,
    209 F.3d 1064 (8th Cir. 2000) ...............................................................21

*Badie v. Bank of Am.*,
    67 Cal. App. 4th 779 (1998) ..................................................................45

*Barker v. Allied Supermarket*,
    596 P.2d 870 (Okla. 1979).....................................................................54

*In re Bennett Funding Grp., Inc.*,
    146 F.3d 136 (2d Cir. 1998) ...................................................................49

*In re Bernard L Madoff Inv. Sec., LLC*,
    605 B.R. 570 (S.D.N.Y. 2019), *aff'd*, 830 F. App'x 669 (2d Cir.
    2020) ......................................................................................................55

*Boguslavsky v. Kaplan*,
    159 F.3d 715 (2d Cir. 1998) ...................................................................53

iii

*Calhoun v. Bergh*,
769 F.3d 409 (6th Cir. 2014) ............................................................21

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002) ......................................................39, 40

*Citizens Bank of Maryland v. Strumpf*,
516 U.S. 16 (1995)............................................................................49

*Connectu LLC v. Zuckerberg*,
522 F.3d 82 (1st Cir. 2008)..............................................................20

*Contant v. Bank of Am. Corp.*,
2018 WL 5292126 (S.D.N.Y. Oct. 25, 2018)............................18, 24

*Cortec Indus., Inc. v. Sum Holding L.P.*,
949 F.2d 42 (2d Cir. 1991) ...............................................................50

*Couldock & Bohan, Inc. v. Société Generale Sec. Corp.*,
93 F. Supp. 2d 220 (D. Conn. 2000)..................................................56

*In re DG Acquisition Corp.*,
151 F.3d 75 (2d Cir. 1998) ...............................................................32

*Dluhos v. Floating and Abandoned Vessel, Known as New York*,
162 F.3d 63 (2d Cir. 1998) ...............................................................16

*Dresdner Bank AG v. M/V Olympia Voyager*,
463 F.3d 1210 (11th Cir. 2006) ........................................................19

*Duffey v. Twentieth Century Fox Film Corp.*,
14 F. Supp. 3d 120 (S.D.N.Y. 2014) ................................................30

*DuMont v. Litton Loan Servicing, LP*,
2015 WL 1061138 (S.D.N.Y. Mar. 11, 2015)...................................26

*ECHO, Inc. v. Whitson Co.*,
52 F.3d 702 (7th Cir. 1995) ..............................................................55

*EdgePoint Cap. Holdings, LLC v. Apothecare Pharm., LLC*,
6 F.4th 50 (1st Cir. 2021)..................................................................56

iv

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*,
720 F.3d 33 (1st Cir. 2013) ...............................................19

*Exch. Nat'l Bank of Chicago v. Touche Ross & Co.*,
544 F.2d 1126 (2d Cir. 1976) ...........................................40

*Fawzy v. Wauquiez Boats SNC*,
873 F.3d 451 (4th Cir. 2017) ...........................................20

*United States ex rel. Foreman v. AECOM*,
19 F.4th 85 (2d Cir. 2021) ...............................36, 37, 38, 39

*Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*,
862 F. Supp. 2d 322 (S.D.N.Y. 2012) ................................29

*Franklin v. Kan. Dep't of Corr.*,
160 F. App'x 730 (10th Cir. 2005) ....................................20

*Fruco Const. Co. v. McClelland*,
192 F.2d 241 (8th Cir. 1951) ...........................................22

*Gallo Wine Distributors, L.L.C. v. Niebaum-Coppola Est. Winery, L.P.*,
56 F. App'x 8 (2d Cir. 2003) .......................................30, 54

*Garrett v. Tandy Corp.*,
295 F.3d 94 (1st Cir. 2002) ..............................................54

*Goel v. Bunge, Ltd.*,
820 F.3d 554 (2d Cir. 2016) .............................................42

*Goldrich v. Masco Corp.*,
2023 WL 2649049 (S.D.N.Y. Mar. 27, 2023) ....................18

*Harris v. City of New York*,
186 F.3d 243 (2d Cir. 1999) ........................................16, 37

*Hecht v. United Collection Bureau, Inc.*,
691 F.3d 218 (2d Cir. 2012) .............................................32

*Hoefling v. City of Miami*,
811 F.3d 1271 (11th Cir. 2016) ........................................19

v

*Hourani v. Mirtchev,*
   943 F. Supp. 2d 159 (D.D.C. 2013) .....................................................22

*Huey v. Honeywell, Inc.,*
   82 F.3d 327 (9th Cir. 1996) ..............................................................22

*InterGen N.V. v. Grina,*
   344 F.3d 134 (1st Cir. 2003) .............................................................19

*James v. Gage,*
   2019 WL 1429520 (S.D.N.Y. Mar. 29, 2019) .................................30

*Jeffrey M. Brown Assocs., Inc. v. Rockville Ctr. Inc.,*
   7 F. App'x 197 (4th Cir. 2001) ........................................................21

*Judon v. Travelers Prop. Cas. Co. of Am.,*
   773 F.3d 495 (3d Cir. 2014) .............................................................18

*Kelley v. Crosfield Catalysts,*
   135 F.3d 1202 (7th Cir. 1998) .....................................................19, 25

*Kilkenny v. L. Off. of Cushner*
   *& Garvey, L.L.P.,* 2012 WL 1638326 (S.D.N.Y. May 8, 2012) .......................30

*King v. Dogan,*
   31 F.3d 344 (5th Cir. 1994) ..............................................................21

*Kolling v. Am. Power Conversion Corp.,*
   347 F.3d 11 (1st Cir. 2003) ...............................................................20

*Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter, Inc.,*
   32 F.2d 195 (2d Cir. 1929) ...............................................................17

*Land v. Dollar,*
   330 U.S. 731 (1947) .........................................................................40

*Laza v. Reish,*
   84 F.3d 578 (2d Cir. 1996) ...............................................................16

*Maloney v. Scottsdale Ins. Co.,*
   256 F. App'x 29 (9th Cir. 2007) ......................................................22

vi

*McMahan & Co. v. Wherehouse Ent., Inc.*,
 65 F.3d 1044 (2d Cir. 1995) ..............................................................47

*In re Millennial Media, Inc. Sec. Litig.*,
 87 F. Supp. 3d 563 (S.D.N.Y. 2015) ...............................................28

*Miller v. Glanz*,
 948 F.2d 1562 (10th Cir. 1991) .........................................................20

*Ministers & Missionaries Benefit Bd. v. Snow*,
 26 N.Y.3d 466 (2015) ........................................................................40

*Mink v. Suthers*,
 482 F.3d 1244 (10th Cir. 2007) .........................................................20

*Morris v. City of New York*,
 2022 WL 2866450 (S.D.N.Y. July 21, 2022) ...................................18

*In re Motors Liquidation Co.*,
 957 F.3d 357 (2d Cir. 2020) ..............................................................24

*New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans
 Archdiocesan Cemeteries*,
 56 F.4th 1026 (5th Cir. 2023) ............................................................21

*New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*,
 442 F.3d 101 (2d Cir. 2006) ..............................................................24

*Nisbet v. Van Tuyl*,
 224 F.2d 66 (7th Cir. 1955) ...............................................................19

*Nolen v. Lufkin Indus., Inc.*,
 469 F. App'x 857 (Fed. Cir. 2012) ....................................................22

*NovaFund Advisors, LLC v. Capitala Group, LLC*,
 2020 WL 230089 (D. Conn. Jan. 14, 2020) ......................................56

*Ortiz v. Fibreboard Corp.*,
 527 U.S. 815 (1999).....................................................................31, 33

*In re Oxford Health Plans, Inc. Secs. Litig.*,
 182 F.R.D. 42 (S.D.N.Y. 1998) ........................................................29

*Palmer v. Thomson & McKinnon Auchincloss, Inc.*,
474 F. Supp. 286 (D. Conn. 1979)......................................................55

*Phillips Petroleum Co. v. Shutts*,
472 U.S. 797 (1985).........................................................................33

*Pinter v. Dahl*,
486 U.S. 622 (1988)..................................................................*passim*

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. LaBranche & Co., Inc.*,
229 F.R.D. 395 (S.D.N.Y. 2004) .......................................................29

*Poindexter v. EMI Rec. Grp. Inc.*,
2012 WL 1027639 (S.D.N.Y. Mar. 27, 2012)....................................30

*Pompano-Windy City Partners, Ltd. v. Bear Stearns & Co.*,
794 F. Supp. 1265 (S.D.N.Y. 1992) ..................................................53

*In re PXRE Group, Ltd.*,
600 F. Supp. 2d 510 (S.D.N.Y. 2009) ...............................................18

*In re Refrigerant Compressors Antitrust Litigation*,
731 F.3d 586 (6th Cir.2013) .............................................................21

*Regional Props., Inc. v. Fin. & Real Est. Consulting Co.*,
752 F.2d 178 (5th Cir. 1985) ............................................................56

*Richards v. Jefferson Cnty., Ala.*,
517 U.S. 793 (1996)..........................................................................31

*Riggs v. Schappell*,
939 F. Supp. 321 (D.N.J. 1996) ........................................................58

*Rodman v. Safeway, Inc.*,
694 F. App'x 612 (9th Cir. 2017) ......................................................40

*Rose v. Mattress Firm, Inc.*,
2021 WL 4520647 (3d Cir. Oct. 4, 2021) ..........................................18

*Rushing v. Wells Fargo Bank, N.A.*,
752 F. Supp. 2d 1254 (M.D. Fla. 2010)..............................................58

viii

*Sacerdote v. New York Univ.*,
  9 F.4th 95 (2d Cir. 2021) ....................................................................17

*In re Samsung Elecs. Co., Ltd.*,
  2 F.4th 1371 (Fed. Cir. 2021) .......................................................22, 23

*SEC v. First Jersey Secs., Inc.*,
  101 F.3d 1450 (2d Cir. 1996) ....................................................*passim*

*SEC v. W.J. Howey Co.*,
  328 U.S. 293 (1946)............................................................................7

*Shell v. Parrish*,
  448 F.2d 528 (6th Cir. 1971) ...........................................................21

*Slayton v. Am. Exp. Co.*,
  460 F.3d 215 (2d Cir. 2006) .......................................................17, 25

*Slomiak v. Bear Stearns & Co.*,
  597 F. Supp. 676 (S.D.N.Y. 1984) ...................................................55

*Smith v. Bayer Corp.*,
  564 U.S. 299 (2011)....................................................................32, 33

*Spencer v. City of Cheyenne*,
  1 F. App'x 863 (10th Cir. 2001) .......................................................20

*Spinelli v. Nat'l Football League*,
  903 F.3d 185 (2d Cir. 2018) ..............................................................7

*Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*,
  2001 WL 1111508 (S.D.N.Y. Sept. 20, 2001) ..................................52

*Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders
  In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*,
  407 F.3d 34 (2d Cir. 2005) ...............................................................24

*Streit v. Bushnell*,
  424 F. Supp. 2d 633 (S.D.N.Y. 2006) ..............................................18

*Taylor v. Sturgell*,
  553 U.S. 880 (2008)..............................................................31, 32, 33

ix

*The Limited, Inc. v. McCrory Corp.*,
   683 F. Supp. 387 (S.D.N.Y. 1988) ....................................................25

*Tran v. Alphonse Hotel Corp.*,
   281 F.3d 23 (2d Cir. 2002) ........................................................17, 25

*United States v. McKeon*,
   738 F.2d 26 (2d Cir. 1984) ...............................................................30

*Van Houtven v. Adams*,
   2014 WL 1338066 (S.D.N.Y. Apr. 3, 2014) .......................................38

*Viterbi v. Wasserman*,
   191 Cal. App. 4th 927 (2011) ............................................................58

*West Run Student Housing Assocs., LLC v. Huntington Nat'l Bank*,
   712 F.3d 165 (3d Cir. 2013) ...............................................17, 18, 25

*Western Fed. Corp. v. Erickson*,
   739 F.2d 1439 (9th Cir. 1984) ...........................................................56

*Wheeler v. Slanovec*,
   2019 WL 2994193 (S.D.N.Y. Jul. 9, 2019).................................26, 30

*Wilson v. Saintine Expl. & Drilling Cmp.*,
   872 F.2d 1124 (2d Cir. 1989) ......................................................51, 52

*Windsor Mills, Inc. v. Collins & Aikman Corp.*,
   25 Cal. App. 3d 987 (1972) .........................................................40, 44

*Xie v. JPMorgan Chase Short-Term Disability Plan*,
   2016 WL 3963113 (S.D.N.Y. Jul. 20, 2016)....................................25

*Young v. City of Mt. Ranier*,
   238 F.3d 567 (4th Cir. 2001) .............................................................20

*Youngers v. Virtus Inv. Partners, Inc.*,
   195 F. Supp. 3d 499 (S.D.N.Y. 2016) .........................................51, 52

**Statutes**

15 U.S.C. § 77e ..................................................................................10

15 U.S.C. § 77*l*(a)(1)............................................................*passim*

x

15 U.S.C. § 77n ...................................................................................4, 46

15 U.S.C. § 77*o* .................................................................................48, 56

15 U.S.C. § 77v ........................................................................................3

15 U.S.C. § 77z-1 .............................................................................*passim*

15 U.S.C. § 78u-4 .............................................................................*passim*

15 U.S.C. § 78aa .....................................................................................3

15 U.S.C. § 78cc ...............................................................................*passim*

15 U.S.C. § 78o(a)(1) ............................................................................10

15 U.S.C. § 78t ................................................................................48, 56

28 U.S.C. § 1291 .....................................................................................3

28 U.S.C. § 1331 .............................................................................3, 8, 10

28 U.S.C. § 1332(d)(2) ......................................................................*passim*

28 U.S.C. § 1367(c)(3) .......................................................................13, 57

Cal. Corp. Code § 25501.5(a)(1) ...........................................................58

Fla. Stat. § 517.211(1) ..........................................................................58

N.J. Stat. § 49:3-71(c) ..........................................................................58

**Rules**

Fed. R. Civ. P. 12(b)(6) .........................................................................37

Fed. R. Civ. P. 15 ............................................................................*passim*

Fed. R. Civ. P. 23 .........................................................................27, 32, 33

**Other Authorities**

6 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal
    Practice and Procedure § 1476 (2d ed. 1990) .....................................16

H.R. Conf. Rep. No. 104-369 (Nov. 28, 1995)........................................................27

## <u>PRELIMINARY STATEMENT</u>

This appeal turns on bedrock principles of civil procedure: an amended complaint supersedes the original, every litigant deserves his own day in court, a complaint may not be dismissed at the pleading stage based on disputed matters extraneous to the pleading, and class action complaints should not devolve into a race to the courthouse. In this putative securities class action, the district court violated *all* of these basic canons by dismissing the Amended Complaint below, not because of any defect in *that* pleading, but because of a *prior* complaint that some, but not all, of Appellants had previously filed that, according to the district court, (i) contradicted the Amended Complaint and (ii) referenced a contract *not* referenced in the Amended Complaint.

The district court's grounds for dismissing the Amended Complaint contravene the longstanding principle that an amended complaint supersedes the original and renders it of no legal effect—a principle that is particularly important in a putative class action governed by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), which was intended to ensure that lead plaintiffs appointed by the court control the content and allegations of the operative complaint. Indeed, the district court's decision to discard the allegations of the Amended Complaint— which the district court candidly noted would "assist plaintiffs in pleading" their claims—is counter to an overwhelming body of caselaw in this circuit and district

courts within this circuit, as well as every other circuit to have decided this issue.

In addition, the district court misidentified what it considered the controlling "user agreement"—the applicability of which Appellees dispute, thus establishing a material issue of fact that cannot be resolved at the pleading stage. The district court's misapplication of a contract that was not incorporated into or relied upon in the Amended Complaint fatally infected the district court's reasoning and adjudication of each of Appellants' claims, *none* of which arises out of transactions under that disputed contract (or any other user agreement), which is why the user agreement is not referenced or relied upon in the Amended Complaint, and it was error for the district court to consider this disputed user agreement in dismissing Appellants' claims in the Amended Complaint.

The district court's decision should be reversed and the case remanded to proceed to discovery.

## STATEMENT OF JURISDICTION

The district court had original jurisdiction over all claims in this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because the matter in controversy exceeds the value of $5,000,000, exclusive of interest and costs, and is a class action in which any member of a class of plaintiffs is a citizen of a State different from any defendant.

The district court also had original jurisdiction over the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act") claims in this action pursuant to 28 U.S.C. § 1331. The district court further had original jurisdiction over the Securities Act claims pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, and over the Exchange Act claims pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa(a).

Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1291 because this is an appeal from a final decision of the district court.

## STATEMENT OF ISSUES

1.     Whether the district court erred by expressly disregarding well-pleaded allegations in the Amended Complaint filed by Appellants Underwood, Oberlander, and Rodriguez, on the ground that those allegations purportedly contradicted a prior complaint that Appellants Underwood and Oberlander filed, but that Appellant Rodriguez did not participate in or join, and that was filed before any Appellant's appointment as lead plaintiff under the PSLRA, 15 U.S.C. §§ 77z-1, 78u-4.

2.     Whether the district court erred in dismissing Appellant Rodriguez's claims by imputing to him the allegations of Appellants Underwood and Oberlander, made in a prior complaint that Appellant Rodriguez never endorsed or joined.

3.     Whether the district court erred in holding that, by purportedly accepting Appellees' form user agreement, Appellants "checkmate[d]" themselves

3

from pleading that Appellees directly sold unregistered securities, notwithstanding the anti-waiver provisions of the Securities Act, 15 U.S.C. § 77n, and the Exchange Act, 15 U.S.C. § 78cc(a).

4. Whether the Amended Complaint states a claim under the Securities Act based upon Appellants' well-pleaded allegations that Appellees sold and offered unregistered securities to Appellants and the proposed class.

5. Whether the Amended Complaint states a claim under the Exchange Act based on Appellees' failure to register with the U.S. Securities and Exchange Commission as a securities exchange and a broker-dealer.

6. Whether the Amended Complaint states claims for controlling person liability under the Securities Act and the Exchange Act.

7. Whether the district court erred by dismissing Appellants' state law claims "based on a decision not to exercise supplemental jurisdiction," when Appellants' state law claims were pleaded solely under the district court's *original* diversity jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2).

8. Whether the Amended Complaint states claims under the securities laws of California, Florida, and New Jersey, which are broader than the analogous federal claims.

4

## STATEMENT OF THE CASE

### A.    Digital Assets, Coinbase, and Crypto-Securities

This case concerns digital assets that use a variety of cryptographic principles to secure transactions, control the creation of additional units, and verify their transfer. The key technology allowing the creation of such digital assets is the blockchain. A-792 ¶ 19.

The two digital asset exchanges (the "Coinbase Exchanges") operated by Appellee Coinbase, Inc. ("Coinbase") are "centralized" exchanges, meaning each user transacts directly with the exchange rather than with one another. A-795 ¶¶ 32-33. That is because centralized exchanges commingle their users' digital assets in communal "wallets," with the exchange tracking how much of the communally held assets should be attributed to any given user. A-795-96 ¶¶ 32-34.

The 79 digital assets at issue in this case (the "Tokens") can be traded either on the blockchain (an "on chain" transaction) or in Coinbase's records (an "off chain" transaction). A-795-96 ¶¶ 32-33. Importantly, the Coinbase Exchanges are in direct privity with their users regardless of whether the transaction is "on chain" or "off chain." A-999 ¶ 910; A-1006 ¶ 936; A-1023 ¶ 1021; A-1030 ¶ 1055; A-1034 ¶ 1077.

For example, to trade Bitcoin for Dogecoin (one of the 79 Tokens) on the Coinbase Exchanges, a hypothetical trader ("Trader A") would first transfer Bitcoin

to Coinbase from a separate Bitcoin wallet he maintains off Coinbase. A-795 ¶¶ 32-33. This would result in a movement of assets on the blockchain indicating that Bitcoin formerly held in Trader A's non-Coinbase wallet would now be held in a wallet owned by Coinbase. A-796 ¶ 34. This transfer of Bitcoin onto Coinbase is an "on chain" transaction solely between Trader A and Coinbase—they would be the only parties in privity on this transaction. A-999 ¶ 910.

Once Trader A decides to trade the Bitcoin he just transferred to Coinbase for a new crypto-asset that is also traded by Coinbase (here, Dogecoin) based upon pricing information that Coinbase provides, that transaction would occur "off chain" and solely between Coinbase and Trader A. A-795 ¶ 33. Coinbase would make a notation in Trader A's account balance recording that a certain amount of Dogecoin should now be attributed to his account instead of a certain amount of Bitcoin. *Id.* At no point would Trader A ever interact with another user holding Dogecoin. *Id.* Instead, each step of Trader A's "off chain" trade of Bitcoin for Dogecoin would occur only between Trader A and Coinbase. *Id.* That is because Coinbase users face Coinbase directly on every transaction, and thus privity exists only between Coinbase and a given user (but not between any two users). *Id.*

The assets traded by Coinbase include a number of digital assets that are securities. Unlike digital assets such as Bitcoin, which are generated at a fixed rate through a decentralized process known as "mining" and are not securities, the 79

6

Tokens are created at the discretion of each Token's issuer. *See* A-801 ¶ 51. The Tokens are securities because they represent the investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others. A-810-999 ¶¶ 77-908; *see generally SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).[1]

None of the Tokens is registered with the U.S. Securities and Exchange Commission ("SEC") as a security. A-788 ¶ 4; A-999 ¶ 909. Despite offering and selling securities, the Coinbase Exchanges are not registered as securities exchanges, and Appellees are not registered as broker-dealers. A-999-1001 ¶¶ 910-16.

**B.    Losses Incurred by Appellants**

Appellants each suffered substantial losses as a result of Appellees' conduct and certified these losses to the district court. Of the 30 distinct Tokens that Appellant Rodriguez traded on the Coinbase Exchanges, he incurred a total of $186,930.60 in realized net losses and $7,058.80 in unrealized net losses with respect to 16 of them. A-421. Of the 69 distinct Tokens that Appellant Oberlander traded on the Coinbase Exchanges, he incurred a total of $4,026.34 in realized losses and $2,395.82 in unrealized losses with respect to 28 of them. A-409-10. Of the 58

---

[1] In their motion to dismiss, Appellees made no substantive argument challenging the Amended Complaint's allegations that the Tokens are securities. *See* Dist. Ct. ECF No. 59 (May 10, 2022). Appellees may not raise the issue for the first time on appeal. *E.g.*, *Spinelli v. Nat'l Football League*, 903 F.3d 185, 198 (2d Cir. 2018).

distinct Tokens that Underwood traded on the Coinbase Exchanges, he incurred a total of $15,071.08 in realized losses and $2,148.67 in unrealized losses with respect to 22 of them. A-423-25.

### C.    Procedural History

Three plaintiffs—Appellants Oberlander and Underwood and non-party Zeneyda Patin—filed the initial complaint in this case against Appellant Coinbase Global, Inc. ("Coinbase Global") on October 8, 2021, and published the requisite PSLRA notice on October 12, 2021. SPA-6. The original complaint invoked the district court's subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1332(d)(2)(A) and asserted claims under the Exchange Act and the securities laws of California and Florida. A-12-13 ¶¶ 9-10; A-87-94 ¶¶ 268-301.

On December 13, 2021, Appellants Oberlander and Underwood and a new plaintiff, Appellant Rodriguez, moved to be appointed lead plaintiffs. SPA-6. Ms. Patin did not seek appointment as lead plaintiff. A-426. The district court granted Appellants' motion on January 11, 2022, and directed the parties to propose a schedule for filing an amended complaint and responsive pleading. A-435.

On January 25, 2022, the district court granted the parties' joint proposed schedule. A-437-38. The district court did not place any restrictions on the scope of the amended complaint. The scheduling order further provided that Appellants "may also amend the [c]onsolidated [a]mended [c]omplaint" in response to a motion to

8

dismiss and set a schedule for briefing any such second motion to dismiss. A-437-38.

That same day, Appellee Coinbase emailed Appellants and other members of the putative class directly to say that Coinbase would unilaterally amend its user agreement effective January 31, 2022. *See* A-440-41. The amendments would, among other things, expand the scope of mandatory arbitration, impose fee shifting for a successful motion to compel arbitration, and require non-arbitrable claims to be litigated in California. *See* A-443-506. Given these changes appeared squarely aimed at impeding the existing class action, Appellants promptly sought a temporary restraining order and preliminary injunction to prevent the proposed changes from taking effect. SPA-7. Appellants stated in their opening brief in their application for injunctive relief that they did "not concede that the current version or any prior version is enforceable or was validly entered into by Plaintiffs or the putative Class." Dist. Ct. ECF No. 25, at 5 n.1 (Jan. 28, 2022). In its opposition, Appellee Coinbase Global (at that point the only named defendant) argued that the motion was premature because the parties had not yet had "a full opportunity to debate whether any provision of any specific user agreement is valid and enforceable." Dist. Ct. ECF No. 30, at 15 (Jan. 30, 2022).

The district court conducted a hearing on Appellants' motion on February 4, 2022, during which Appellants informed the district court that their forthcoming

amended complaint would assert additional claims, including under Section 12(a)(1) of the Securities Act, and might name additional defendants. *See* A-770-71 at 33:22-34:13; A-777 at 40:8-15. After the hearing, the parties entered into a February 7, 2022 stipulation and order resolving Appellants' motion, in which Appellees agreed not to rely on their proposed amendment to the user agreement for the purposes of this class action. *See* A-734-37.

Pursuant to the district court's scheduling order, Appellants filed the Amended Complaint on March 11, 2022. SPA-7. The district court recognized that the Amended Complaint "changed [Appellants'] claims in nature and scope by, *inter alia*, (1) adding Coinbase, Inc. as a defendant; (2) adding to the digital assets within the scope of the lawsuit, in connection with the addition of Rodriguez as a named plaintiff; and (3) adding federal claims, including those relating to control-person liability, and state claims." *Id.* The Amended Complaint also named Coinbase Global CEO Brian Armstrong as a defendant. A-781. The Amended Complaint invoked the district court's original diversity jurisdiction under CAFA, 28 U.S.C. § 1332(d)(2)(A); federal-question jurisdiction under 28 U.S.C. § 1331; and exclusive jurisdiction under the Securities Act and Exchange Act, 15 U.S.C. §§ 77e, 78o(a)(1), 78cc(b). A-790-91 ¶¶ 13-15. Appellees moved to dismiss the Amended Complaint in its entirety on May 10, 2022, and briefing concluded on August 5, 2022. SPA-7. The district court did not hold oral argument.

**D.    The Decision Below**

On February 1, 2023, the district court issued an opinion and order granting Appellees' motion in full, dismissing Appellants' federal claims with prejudice and dismissing Appellants' state claims without prejudice. SPA-1-27.

Although the district court held that the well-pleaded allegations in the Amended Complaint "would ordinarily assist [Appellants] in pleading" violations of the Securities Act, the district court disregarded them on the ground that they "effectively repudiate[d] diametrically contrary allegations in [the] original [c]omplaint, in an apparent attempt to evade dismissal," notwithstanding that the Amended Complaint had been filed *before* any motion to dismiss was ever filed. SPA-12. Based entirely on (i) the allegations in the *original* complaint and (ii) the user agreement referenced in the original complaint (but *not* referenced in the Amended Complaint, and not alleged in *any* complaint to be binding on any Appellant), the district court held that Appellants could not establish that Appellees were direct sellers of the Tokens under *Pinter v. Dahl*, 486 U.S. 622 (1988). *See* SPA-12-17. The district court reasoned that the user agreement was "cognizable" on the motion to dismiss the Amended Complaint because it was "incorporated by reference" in the original complaint and "was put on the case record by [Appellants]" when Appellants, before filing the Amended Complaint, "sought to enjoin [Appellees] from enforcing an updated user agreement against [Appellants and

absent class members] with respect to its dispute resolution provisions," SPA-13-15, notwithstanding that Appellants in their prior motion for an injunction did "not concede that the current version or any prior version is enforceable or was validly entered into by Plaintiffs or the putative Class," Dist. Ct. ECF No. 25, at 5 n.1 (Jan. 28, 2022). The district court further held that Appellants failed to adequately plead "solicitation" by Appellees, which would be an alternative basis for finding Appellees to be sellers under *Pinter*. *See* SPA-17-19. The district court dismissed the controlling person claims under the Securities Act based on the purported deficiencies with the direct claim. SPA-19.

The district court similarly dismissed Appellants' direct and controlling person claims under Section 29(b) of the Exchange Act based on the allegations in the original complaint and the user agreement referenced in the original complaint (but not in the Amended Complaint). *See* SPA-20-24. Although the district court acknowledged that the "Amended Complaint … excises all references to the [u]ser [a]greement," the district court nonetheless relied on the original complaint "for the [same] reasons" it did so in analyzing the Securities Act claims, concluding that "once [the] earlier allegations in the [original complaint] as to the same transactions regarding the Tokens are treated as cognizable, the [Amended Complaint's] bid to pursue claims for rescission based on a course of dealings not involving the [u]ser [a]greement becomes unsustainable." SPA-23. Based on its conclusion that the user

agreement "definitely would not" support rescission under Section 29(b), the district court dismissed the Exchange Act claims. SPA-23-24.

The district court dismissed all of Appellants' federal claims with prejudice and denied Appellants' motion to replead their federal claims, reasoning that "amend[ment] would be futile" because Appellants "already had an opportunity to amend their complaint" and "they did so by adding numerous allegations that directly contradicted their initial [c]omplaint." SPA-25-26. The district court further found that Appellants had not identified amendments that would cure the pleading deficiencies found by the district court. SPA-26.

Finally, the district court declined to exercise supplemental jurisdiction over Appellants' state law claims and dismissed them without prejudice pursuant to 28 U.S.C. § 1367(c)(3) solely on the ground that it had "dismissed all claims over which it ha[d] original jurisdiction." SPA-24-25. The district court did not address Appellants' undisputed statement that the district court had *original* jurisdiction over the state law claims pursuant to CAFA. A-790 ¶ 13.

## **SUMMARY OF ARGUMENT**

In dismissing the Amended Complaint, the district court misapplied the law and misconstrued the record. Its judgment should be reversed.

*First*, the district court improperly disregarded the Amended Complaint's well-pleaded allegations and improperly relied on the court's own interpretation of

13

superseded allegations in the prior complaint. In doing so, the district court transgressed the limited scope of permitted review under Federal Rule of Civil Procedure ("Rule") 12(b)(6) and undermined both Rule 15's liberal amendment standard and the PSLRA's lead-plaintiff selection process. A failure to reverse the decision below would needlessly result in a multiplicity of separate securities class actions being filed, lest a later-filing plaintiff be held to every allegation in the first-filed complaint.

*Second*, the decision below improperly relied on the district court's interpretation of disputed language from a Coinbase user agreement that is neither referenced in nor integral to the Amended Complaint. The *original* complaint's reference to the user agreement is immaterial, because the original complaint lost all legal effect when it was superseded by the Amended Complaint. Nor did Appellants' references to the user agreement in connection with their prior motion for a preliminary injunction authorize the district court to consider it on a motion to dismiss. The requested prior interim injunctive relief was necessitated by Appellees' wrongful effort to unilaterally impose new arbitration and fee-shifting terms on Appellants after this case was underway but before the Amended Complaint was filed. In seeking preliminary injunctive relief to prevent Appellees' proposed change, Appellants expressly stated they were *not* conceding the user agreement's applicability. Moreover, by relying on the user agreement to dismiss Appellants'

claims, the district court contravened the anti-waiver provisions of the federal securities laws.

*Third*, the district court erred in dismissing the Amended Complaint even though it adequately pleads primary violations of the Securities Act and Exchange Act, controlling person claims under both, and claims under the securities laws of California, Florida, and New Jersey. Coinbase is strictly liable under Section 12(a)(1) of the Securities Act for selling unregistered securities under either one of two *independent* reasons: (1) Coinbase held title to the Tokens in a centralized wallet and transferred them directly to purchasers, and (2) Coinbase actively solicited sales of the Tokens by, *inter alia*, providing real-time pricing information on its website. In addition, each sale of Tokens by Coinbase was an unlawful contract for sale of securities voidable under Section 29(b) of the Exchange Act. Coinbase Global and its CEO, Armstrong, are liable as controlling persons for both sets of claims. For the same reasons, the state law claims against all three Appellees, over which the district court has original diversity jurisdiction pursuant to CAFA and which are broader than the analogous federal claims, are adequately pled.

This Court should reverse the decision below and remand so Appellants may pursue their claims.

**ARGUMENT**

I.    **The District Court Erred By Failing To Give Effect To Appellants'
      Filing Of An Amended Complaint After Their Appointment As Lead
      Plaintiffs**

    A.    **An Amended Complaint Supersedes Prior Complaints, Including
           Any Prior Allegations That Purportedly Contradict The
           Amended Complaint**

The district court dismissed Appellants' claim that Appellees directly sold
unregistered securities, not because of any pleading defect in the Amended
Complaint, but solely because the court believed the Amended Complaint was
contradicted by the prior complaint filed by Appellants Oberlander and Underwood
(but not Appellant Rodriguez). SPA-11-12. This ground for dismissal is erroneous
and merits reversal.

On a motion to dismiss, a district court must "look only to the allegations in
[the plaintiff's] most recent complaint as it is well established that an amended
complaint ordinarily supercedes the original, and renders it of no legal effect."
*Dluhos v. Floating and Abandoned Vessel, Known as New York*, 162 F.3d 63, 68 (2d
Cir. 1998) (cleaned up); *see also Laza v. Reish*, 84 F.3d 578, 581 (2d Cir. 1996)
("Once an amended pleading is interposed, the original pleading no longer performs
any function in the case." (quoting 6 Charles A. Wright, Arthur R. Miller & Mary
Kay Kane, Federal Practice and Procedure § 1476 (2d ed. 1990))); *Harris v. City of
New York*, 186 F.3d 243, 249 (2d Cir. 1999) (on a motion to dismiss, courts must
"look to the allegations in [plaintiff's] Amended Complaint, which is the legally

16

effective pleading for Rule 12(b)(6) purposes"). Accordingly, "[a] statement in a withdrawn complaint that is superseded by an amended complaint without the statement is no longer a conclusive judicial admission." *Tran v. Alphonse Hotel Corp.*, 281 F.3d 23, 32 (2d Cir. 2002), *overruled on other grounds*, *Slayton v. Am. Exp. Co.*, 460 F.3d 215, 226-28 (2d Cir. 2006).

It is well-established that superseded pleadings are merely "controvertible" evidence, not "conclusive" grounds for judgment against the plaintiff. *Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter, Inc.*, 32 F.2d 195, 198 (2d Cir. 1929); *accord Tran*, 281 F.3d at 32. This black-letter law is grounded in the text and purpose of Rule 15, which provides that "a party may amend its pleading" with leave of the court, which should be "freely give[n] when justice so requires." Fed. R. Civ. P. 15. Rule 15's "liberal" and "permissive" amendment standard, *Sacerdote v. New York Univ.*, 9 F.4th 95, 115 (2d Cir. 2021), would be undermined if amended complaints were not given full effect on a motion to dismiss. *See West Run Student Housing Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165, 172 (3d Cir. 2013) ("[E]ffectively disallowing amendment by looking to the original pleading [on a motion to dismiss] is contrary to the liberal amendment policy embodied in Rule 15."). As then-District Judge Sullivan and numerous other courts have recognized,

> It is not uncommon for litigants to amend pleadings in response to deficiencies pointed out by an adversary or even by the Court …. It would be a harsh rule of law indeed if a litigant were to change a statement in an

17

> amended pleading to repair a weakness cited by an
> adversary or by the Court, only to have the case dismissed
> because the conforming change in some way may conflict
> with an allegation in the earlier pleadings.

*In re PXRE Group, Ltd.*, 600 F. Supp. 2d 510, 526 (S.D.N.Y. 2009) (quoting *Streit v. Bushnell*, 424 F. Supp. 2d 633, 639 n.4 (S.D.N.Y. 2006)); *accord Goldrich v. Masco Corp.*, 2023 WL 2649049, at *3 (S.D.N.Y. Mar. 27, 2023); *Morris v. City of New York*, 2022 WL 2866450, at *1 (S.D.N.Y. July 21, 2022); *Contant v. Bank of Am. Corp.*, 2018 WL 5292126, at *3 (S.D.N.Y. Oct. 25, 2018).

Applying the same principles articulated by this Court, nearly every other circuit has squarely held that, because an amended complaint supersedes the original and renders it without legal effect, any allegations contained only in the superseded original complaint no longer bind the plaintiff.

For example, the Third Circuit, in *West Run Student Housing Associates*, reversed the dismissal of an amended complaint that was inconsistent with the original because "judicial admissions may be withdrawn by amendment," and Rule 15 allows plaintiffs to change their factual allegations "even when the proposed amendment flatly contradicts the initial allegation." 712 F.3d at 171-72. The Third Circuit has repeatedly reaffirmed this principle. *Judon v. Travelers Prop. Cas. Co. of Am.*, 773 F.3d 495, 503 n.6 (3d Cir. 2014); *see also Rose v. Mattress Firm, Inc.*, 2021 WL 4520647, at *2 (3d Cir. Oct. 4, 2021) (non-precedential).

18

The Seventh Circuit has also repeatedly reached the same conclusion. In *Kelley v. Crosfield Catalysts*, the court reversed the dismissal of a claim based on allegations in prior complaints, reasoning that "[a]ny facts that [plaintiff] had pleaded in his first two complaints were effectively nullified for 12(b)(6) purposes when he filed his Second Amended Complaint, which did not reference those facts." 135 F.3d 1202, 1205 (7th Cir. 1998). In *188 LLC v. Trinity Industries, Inc.*, the court similarly reversed a dismissal based on a contract referenced in prior pleadings, reasoning that "[t]he prior pleading is in effect withdrawn as to all matters not restated in the amended pleading and becomes functus officio." 300 F.3d 730, 735-36 (7th Cir. 2002) (quoting *Nisbet v. Van Tuyl,* 224 F.2d 66, 71 (7th Cir. 1955)).

The Eleventh Circuit's cases likewise "do not permit a district court to consider, on a motion to dismiss, exhibits attached to an earlier complaint that a plaintiff has expressly disavowed or rejected as untrue in a subsequent amended complaint." *Hoefling v. City of Miami*, 811 F.3d 1271, 1277 (11th Cir. 2016) (citing *Dresdner Bank AG v. M/V Olympia Voyager,* 463 F.3d 1210, 1215 (11th Cir. 2006)).

The First Circuit has also repeatedly held that "[a]n amended complaint supersedes the original complaint, and facts that are neither repeated nor otherwise incorporated into the amended complaint no longer bind the pleader," *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 40 n.2 (1st Cir. 2013) (quoting *InterGen N.V. v. Grina,* 344 F.3d 134, 145 (1st Cir. 2003)), and that "[t]he earlier

19

complaint is a dead letter and 'no longer performs any function in the case,'" *Connectu LLC v. Zuckerberg*, 522 F.3d 82, 91 (1st Cir. 2008) (quoting *Kolling v. Am. Power Conversion Corp.*, 347 F.3d 11, 16 (1st Cir. 2003)).

The Tenth Circuit has similarly held that "an amended complaint supercedes an original complaint and renders the original complaint without legal effect," *Mink v. Suthers*, 482 F.3d 1244, 1254 (10th Cir. 2007) (internal quotation marks omitted), so on a motion to dismiss, a court must "look to plaintiff's amended complaint filed pursuant to Rule 15(a) because the amended complaint supersedes the original," *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991); *accord Franklin v. Kan. Dep't of Corr.*, 160 F. App'x 730, 734 (10th Cir. 2005) ("An amended complaint supersedes the original complaint and renders the original complaint of no legal effect."); *Spencer v. City of Cheyenne*, 1 F. App'x 863, 864-65 (10th Cir. 2001) (same).

The Fourth Circuit has likewise repeatedly held that "a properly filed amended complaint supersedes the original one and becomes the operative complaint in the case, … render[ing] the original complaint 'of no effect.'" *Fawzy v. Wauquiez Boats SNC*, 873 F.3d 451, 455 (4th Cir. 2017) (quoting *Young v. City of Mt. Ranier*, 238 F.3d 567, 573 (4th Cir. 2001)). A district court in the Fourth Circuit thus errs if it considers allegations in a superseded original complaint to dismiss an amended

complaint. *Jeffrey M. Brown Assocs., Inc. v. Rockville Ctr. Inc.*, 7 F. App'x 197, 202 (4th Cir. 2001).

In the Fifth Circuit, too, "[a]n amended complaint supersedes the original complaint and renders it of no legal effect unless the amended complaint specifically refers to and adopts or incorporates by reference the earlier pleading." *New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans Archdiocesan Cemeteries*, 56 F.4th 1026, 1033 (5th Cir. 2023) (quoting *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994)).

The Sixth Circuit has also repeatedly held that "[a]n amended complaint supersedes an earlier complaint for all purposes." *Calhoun v. Bergh*, 769 F.3d 409, 410 (6th Cir. 2014) (quoting *In re Refrigerant Compressors Antitrust Litigation*, 731 F.3d 586, 589 (6th Cir.2013)). "Where a pleading has been amended or superseded by another pleading, it is necessary that a party offer in evidence the original or superseded pleading if he desires to make use of an admission therein contained." *Shell v. Parrish*, 448 F.2d 528, 530 (6th Cir. 1971).

It is likewise "well-established" in the Eighth Circuit "that an amended complaint supercedes an original complaint and renders the original complaint without legal effect." *In re Atlas Van Lines, Inc.*, 209 F.3d 1064, 1067 (8th Cir. 2000). Because "[a]n abandoned or superseded pleading is out of the case, so far as admissions by rule of pleading are concerned," superseded allegations do not

constitute judicial admissions. *Fruco Const. Co. v. McClelland*, 192 F.2d 241, 245 (8th Cir. 1951).

The Federal Circuit has observed that courts "uniformly" treat superseded pleadings as "dead letters" that "no longer perform any function in the case." *In re Samsung Elecs. Co., Ltd.*, 2 F.4th 1371, 1376 (Fed. Cir. 2021). Similarly, the Federal Circuit has held that, because "an amended pleading supersedes the original for all purposes," only the amended complaint counts for purposes of determining jurisdiction. *Nolen v. Lufkin Indus., Inc.*, 469 F. App'x 857, 860 (Fed. Cir. 2012).

Although some district courts in the Ninth and D.C. Circuits have suggested that superseded pleadings may be considered when they contradict the amended pleadings, those decisions are a distinct minority, and in any event, neither court of appeals in those circuits has adopted a rule like the one applied by the district court here, and courts in both circuits have repeatedly reaffirmed the rule that superseded allegations are not binding judicial admissions. *See, e.g.*, *Maloney v. Scottsdale Ins. Co.*, 256 F. App'x 29, 32 (9th Cir. 2007) ("When a complaint containing a judicial admission is amended, the information admitted in the original complaint is no longer conclusively established.") (citing *Huey v. Honeywell, Inc.*, 82 F.3d 327, 333 (9th Cir. 1996)); *Hourani v. Mirtchev*, 943 F. Supp. 2d 159, 163-71 (D.D.C. 2013) (in discussing a motion for *sanctions*, the district court noted that superseded allegations may sometimes defeat blatantly contradictory amended allegations made

22

in bad faith, but the court nonetheless denied sanctions and resolved the motion to *dismiss* based solely on the amended complaint).

The district court's decision below violated this settled law and the rule "uniformly" applied by other circuit courts considering this issue. *In re Samsung*, 2 F.4th at 1376. The district court found that the original complaint contradicted (1) "the [Amended Complaint's] claim that privity existed only between Coinbase and users, and not between users for the purposes of any individual transaction," and (2) the Amended Complaint's "factual allegations about *who* holds title to the Tokens." SPA-13. Neither difference between the Amended Complaint and the initial complaint is a proper ground for dismissal.

Contrary to the district court's conclusion, Oberlander's and Underwood's initial complaint's colloquial allegation that Coinbase users can trade "with" other users does not rise to the level of an admission that Coinbase users were in *legal privity* with one another, rather than with the intermediate exchange. *See id.* Nor did the initial complaint contain any allegation suggesting that Coinbase did *not* hold title to Tokens. And even assuming the Amended Complaint did, as the district court held, contradict the initial complaint's allegations about which parties were in privity and who held title to the Tokens, such allegations could not bind Appellants for two independent reasons.

23

*First*, "[t]o constitute a judicial admission, the statement must be one of fact—a legal conclusion does not suffice." *In re Motors Liquidation Co.*, 957 F.3d 357, 360 (2d Cir. 2020). But "privity [is] a legal conclusion," *Amalgamated Sugar Co. v. NL Indus., Inc.*, 825 F.2d 634, 640 (2d Cir. 1987), and "who owns a given item of personal property is a mixed question of law and fact." *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 111 (2d Cir. 2006). This Court has thus repeatedly refused to deem statements concerning the legal effect of purported contracts as binding judicial admissions. *E.g.*, *In re Motors*, 957 F.3d at 361; *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 407 F.3d 34, 45 (2d Cir. 2005). The same is true for any purported allegations of privity or ownership in the initial complaint.

*Second*, even to the extent such initial allegations were factual (which they are not), they did not go to any facts within any Appellant's personal knowledge. Oberlander and Underwood necessarily relied on the investigation of their initial counsel as to privity and title, and it was appropriate for them to update their allegations on these complex issues (and for Rodriguez to make such allegations for the first time) in the Amended Complaint based on discussions with Rodriguez's counsel, who did not participate in drafting the initial complaint. *See Contant*, 2018 WL 5292126, at *3 (amended complaint properly "correct[ed] and clarifie[d] a description of a complex business transaction outside the ken of Plaintiffs and their

24

lawyers"). In any event, even if the Amended Complaint's *omission* of references to the Coinbase user agreement could be construed as an affirmative allegation that contradicted the initial complaint's references to the user agreement, any such contradiction would relate solely to the *legal effect* of the user agreement's terms, and not to a factual point, such as the agreement's mere existence.

Even if there were factual contradictions between the original complaint and the Amended Complaint (and there are not), the district court's reliance on such contradictions to dismiss the Amended Complaint violates the established law of this and other circuits. *See, e.g.*, *Tran*, 281 F.3d at 32; *West Run Student Housing Assocs.*, 712 F.3d at 171-72; *Kelley*, 135 F.3d at 1205. Besides creating an *inter*-circuit split with the ten other circuit courts that have ruled on this issue, the district court's ruling also creates an *intra*-circuit split, as numerous district courts in the Second Circuit have long recognized that "[p]rior inconsistent pleadings … are controvertible, not conclusive, admissions" and thus not grounds for dismissal. *The Limited, Inc. v. McCrory Corp.*, 683 F. Supp. 387, 395 n.5 (S.D.N.Y. 1988); *see also Xie v. JPMorgan Chase Short-Term Disability Plan*, 2016 WL 3963113, at *3 (S.D.N.Y. Jul. 20, 2016) ("[A]t the motion to dismiss stage … any attempt to use Plaintiff's prior pleadings against her as an admission is premature.").

Although some district courts in this Circuit have disregarded amended allegations, they have done so only on those "rare occasions" when the amended

complaint is clearly "manipulated," *DuMont v. Litton Loan Servicing, LP*, 2015 WL 1061138, at *8 (S.D.N.Y. Mar. 11, 2015), because it blatantly contradicts the prior complaint on a factual matter squarely within the plaintiff's personal knowledge— and even then only in circumstances with independent grounds for crediting the original allegation over the amended version. *See, e.g.*, *Wheeler v. Slanovec*, 2019 WL 2994193, at *6 (S.D.N.Y. Jul. 9, 2019) (declining to credit amended pleading that changed date, by more than two years, on which the plaintiff supposedly learned of forged warrants that were the basis of his claim in an attempt to conform to the statute of limitations). As noted above, the issue on which the district court found a purported contradiction is not a question of fact (*e.g.*, whether the plaintiff purchased his tokens on January 1 rather than June 1), but rather goes to a legal question— namely, who was in privity with whom in the at-issue transactions. Simply put, the district court's decision below is an outlier, both within and without this Circuit, in choosing to disregard amended allegations on matters *outside* the plaintiffs' personal knowledge.

> **B.** **The Private Securities Litigation Reform Act Requires Courts To Give Effect To Amended Complaints Filed By Appointed Lead Plaintiffs**

Beyond transgressing the well-established bounds of Rules 12(b)(6) and 15, the district court's decision to rely on allegations in a prior complaint to refute well-

pleaded allegations in the Amended Complaint also runs contrary to the text and purpose of the PSLRA.

Under the PSLRA, a plaintiff must publish a notice of a covered class action within 20 days after filing, and any member of a purported class may move to serve as lead plaintiff within 60 days after such notice. *See* 15 U.S.C. §§ 77z-1(a)(3)(A)(i), 78u-4(a)(3)(A)(i). Within 90 days of the notice, the court must appoint one or more lead plaintiffs whom "the court determines to be most capable of adequately representing the interests of class members." 15 U.S.C. §§ 77z-1(a)(3)(B)(i), 78u-4(a)(3)(B)(i). The PSLRA sets a rebuttable presumption that the most adequate lead plaintiffs are those who (i) filed the complaint or moved to serve as lead plaintiffs, (ii) have the largest financial interests in the relief sought by the class, and (iii) otherwise satisfy the requirements of Rule 23. *See* 15 U.S.C. §§ 77z-1(a)(3)(B)(iii)(I), 78u-4(a)(3)(B)(iii)(I).

The PSLRA's legislative history makes clear that the core purposes of these statutory procedures were to avoid a "race to the courthouse," to ensure that "the selection of the lead plaintiff and lead counsel should rest on considerations other than how quickly a plaintiff has filed its complaint," and to encourage courts to give "[]sufficient consideration to the most thoroughly researched, but later filed, complaint." H.R. Conf. Rep. No. 104-369, at 33 (Nov. 28, 1995). Indeed, the PSLRA permits the district court to appoint as lead plaintiff a movant who has not previously

filed his own complaint or joined the first-filed complaint. Under such circumstances, the lead plaintiff would necessarily *have* to file an amended complaint after his appointment.

The district court's decision below, if sustained, would unravel the careful balance Congress struck in the PSLRA, by instead creating perverse incentives to be first at the courthouse and/or refuse to move consensually with competing lead plaintiffs. Any prospective lead plaintiff who has not yet filed a complaint would need to scrutinize the initial complaint line-by-line to determine whether it contains *even one* allegation he might want to alter as lead plaintiff. If so, the prospective lead plaintiff would be forced to file his own complaint before seeking appointment. This procedure is inefficient and would lead to a snowstorm of securities complaints, replicating the "race to the courthouse" the PSLRA was designed to curtail.

Adopting the rule applied by the district court would also lead to more contested motion practice over lead plaintiff appointment. Movants would have an incentive to oppose the appointment of the first-filing plaintiff as co-lead plaintiff, lest the movants be held to the first-filing plaintiff's initial allegations, as the district court did here. Movants would also be discouraged from joining with a small number of other class members to be appointed co-lead plaintiffs, as it could bind them to the initial allegations set forth by those other plaintiffs. *See generally In re Millennial*

28

*Media, Inc. Sec. Litig.*, 87 F. Supp. 3d 563, 570-71 (S.D.N.Y. 2015) (collecting authorities supporting the appointment of co-lead plaintiffs).

Consensual co-plaintiff arrangements can benefit the proposed class by expanding the scope of possible class claims—for example by relying on an earlier filing date for purposes of determining which claims are within the statute of limitations or giving rise to additional state law claims that only a subsequent plaintiff, from a different state than the first plaintiff, would have standing to bring. Such arrangements may also help ensure continuity of class representation in the event one plaintiff is no longer able to serve, *cf. Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*, 862 F. Supp. 2d 322, 326-27 (S.D.N.Y. 2012) (describing challenges in appointing replacement lead plaintiff, given the lack of a procedure in the PSLRA), and enable "pooling, not only of the knowledge and experience, but also of the resources of the plaintiffs' counsel in order to support what could prove to be a costly and time-consuming litigation," *In re Oxford Health Plans, Inc. Secs. Litig.*, 182 F.R.D. 42, 46 (S.D.N.Y. 1998); *accord Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. LaBranche & Co., Inc.*, 229 F.R.D. 395, 420 (S.D.N.Y. 2004).

None of the cases cited by the district court, or by Appellees in their briefing below, remotely suggests that the allegations in a first-filed complaint subject to the PSLRA may defeat the well-pleaded allegations of lead plaintiffs in an amended

complaint filed after their appointment under the PSLRA. None of those cited cases was a class action, let alone a class action subject to the PSLRA. *See* SPA-12 (citing *Andrews*, 882 F.2d 705 (individual negligence action); *United States v. McKeon*, 738 F.2d 26 (2d Cir. 1984) (criminal prosecution); *Wheeler*, 2019 WL 2994193 (individual civil rights action); *Kilkenny v. L. Off. of Cushner & Garvey, L.L.P.*, 2012 WL 1638326 (S.D.N.Y. May 8, 2012) (individual employment action); *Poindexter v. EMI Rec. Grp. Inc.*, 2012 WL 1027639 (S.D.N.Y. Mar. 27, 2012) (individual copyright action)); *see also* Dist. Ct. ECF No. 59, at 10 (May 10, 2022) (Appellees' motion to dismiss brief below) (citing *James v. Gage*, 2019 WL 1429520 (S.D.N.Y. Mar. 29, 2019) (individual civil rights action); *Duffey v. Twentieth Century Fox Film Corp.*, 14 F. Supp. 3d 120 (S.D.N.Y. 2014) (individual action for breach of contract and statutory violation)).

Accordingly, the district court erred by ignoring well-pleaded allegations in the lead plaintiffs' Amended Complaint based only on a purported contradiction with the initial complaint filed before the appointment of any lead plaintiff.

### C. The District Court's Reliance On Superseded Allegations Is Especially Improper As To Appellant Rodriguez, Who *Never Joined* The Prior Allegations On Which The District Court Relied

Even assuming the district court properly dismissed Oberlander's and Underwood's claims (which it did not), Appellant Rodriguez's claims must survive. Rodriguez never filed any allegations that could potentially contradict the Amended

Complaint, which was *the only complaint he filed in this action*. Punishing Rodriguez for a different set of plaintiffs' allegations conflicts with the "deep-rooted historic tradition that everyone should have his own day in court." *Taylor v. Sturgell*, 553 U.S. 880, 892-93 (2008) (quoting *Richards v. Jefferson Cnty., Ala.*, 517 U.S. 793, 798 (1996)).

The district court's imputation to Rodriguez of prior allegations by other plaintiffs rests on a novel and unprecedented theory of virtual representation that directly contradicts binding precedent. The district court waved away any concerns that binding Rodriguez to the allegations in the original complaint would "unfairly injure" him by reasoning that Rodriguez "had his interests adequately represented by someone with the same interests who [was] a party." SPA-13-14 n.5 (cleaned up) (quoting *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 846 (1999)). That is incorrect on multiple levels.

At the outset, the adequate-representation principle on which the district court relied does not apply to mere *allegations* in a putative class action complaint but instead concerns the standard for binding non-parties to a final *judgment* under the doctrine of res judicata. *See Ortiz*, 527 U.S. at 846 (describing adequate representation as "an exception to the general rule" against non-party preclusion); *Taylor*, 553 U.S. at 892 (classifying preclusion rules under the doctrine of res judicata). Because "res judicata simply does not apply where, as here, there is no

31

prior final or appealable order," *In re DG Acquisition Corp.*, 151 F.3d 75, 85 (2d Cir. 1998), the principle of adequate representation cannot support the decision below, *see Smith v. Bayer Corp.*, 564 U.S. 299, 315 (2011) ("Neither a proposed class action nor a rejected class action may bind nonparties.").

Even if the adequate-representation exception to non-party preclusion were available here (and it is not), the circumstances of this case do not permit its application. "Representative suits with preclusive effect on nonparties include properly conducted class actions and suits brought by trustees, guardians, and other fiduciaries." *Taylor*, 553 U.S. at 894 (citations omitted). It is well "established that representation is 'adequate' for purposes of nonparty preclusion only if (at a minimum) one of … two circumstances is present": "either special procedures to protect the nonparties' interests or an understanding by the concerned parties that the first suit was brought in a representative capacity." *Id*. at 897. Neither circumstance is present here.

*First*, Rodriguez was not protected by any "special procedures" before his appointment as lead plaintiff. Rule 23 specifies the procedures necessary to protect the interests of absent class members, who are entitled to receive notice and an opportunity to opt out before they can be bound. *See* Fed. R. Civ. P. 23(c)(2), (e)(4); *Hecht v. United Collection Bureau, Inc.*, 691 F.3d 218, 222 (2d Cir. 2012) ("Absent class members have a due process right to notice and an opportunity to opt out of

class litigation when the action is 'predominantly' for money damages." (quoting *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 811-12 & n.3 (1985)). But Rodriguez received no protection from those procedures because no class was certified. Unless and until a class is certified under Rule 23, the action is "*not* a class action" and has no binding effect on nonparties. *Smith*, 564 U.S. at 314-15 (holding an absent putative class member was not bound by judgment in action where class certification was denied).

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), illustrates the fundamental error in the decision below. In *Ortiz*, a district court certified a mandatory class of individuals with personal injury claims against the defendant and approved a global settlement resolving such claims, *id.* at 825-27, and the Fifth Circuit affirmed, *id.* at 830. The Supreme Court reversed, reasoning in relevant part that the district court "took no steps" to protect absent class members' interests and improperly relied on *post hoc* rationalizations of adequate representation. *Id.* at 831-32. Here, the district court likewise made no effort to support its conclusory statement that Rodriguez's interests were adequately represented by the named plaintiffs who filed the original complaint. SPA-14 n.5.

*Second*, the named plaintiffs in the original complaint could not have "understood themselves to be acting in a representative capacity," *Taylor*, 553 U.S. at 898, because they expressly alleged that they were "*seek[ing]* class certification,"

33

A-83-84 ¶ 253 (emphasis added). Nor did Rodriguez ever explicitly or implicitly acquiesce to being represented by those plaintiffs before they filed the original complaint. To the contrary—Rodriguez sought appointment as lead plaintiff precisely because he did *not* want to entrust his interests solely to initial plaintiffs Oberlander and Underwood.

Moreover, Rodriguez never adopted Oberlander's and Underwood's prior allegations simply by joining with them in a motion for appointment as co-lead plaintiffs. That motion expressly stated that Rodriguez "intend[ed] to assert [additional claims] in an amended complaint." Dist. Ct. ECF No. 17, at 9 (Dec. 13, 2021). Rodriguez's PSLRA certification likewise stated only that he "authorize[d] the filing of a *comparable* complaint on [his] behalf"—not that he consented to be bound by every one of the initial complaint's allegations. A-422-25 (emphasis added). After being appointed lead plaintiffs, Rodriguez and the other Appellants did not endorse the original complaint, but instead reiterated during the February 4, 2022 hearing that they "intended to file an amended complaint," SPA-7, in keeping with the structure of the PSLRA, and would in fact assert additional claims. *See supra* Part I.B.

To the extent Appellees argue that Rodriguez implicitly adopted Oberlander's and Underwood's initial allegations by consenting to work with them as co-lead plaintiffs, that reasoning has no basis in caselaw, and adopting it would contravene

34

the policy of the PSLRA. Under such a rule, if Rodriguez wanted to avoid having Underwood and Oberlander's prior allegations held against him, he would have, inefficiently, had to (1) file a separate complaint against Appellees in his own name, and (2) move in opposition to Underwood and Oberlander's application to serve as lead plaintiffs, rather than move jointly with them for appointment as co-lead plaintiffs. These requirements would make securities litigation more burdensome and expensive, and would deprive absent class members of the benefits of optimal representation by co-lead plaintiffs, contrary to the PSLRA's intent. *See supra* Part I.B.

Moreover, requiring Rodriguez to file an individual complaint to be appointed lead plaintiff (or else be saddled with other plaintiffs' prior allegations) would violate the text of the PSLRA, which provides that the plaintiff with the largest losses is the presumptive lead plaintiff regardless of whether he filed a complaint at the outset. 15 U.S.C. §§ 77z-1(a)(3)(B)(iii), 78u-4(a)(3)(B)(iii). Rodriguez had the largest losses of any proposed lead plaintiff here, and therefore was presumptively entitled under the PSLRA to direct the course of this litigation. A-431.

Accordingly, even if Oberlander's and Underwood's claims in the Amended Complaint could be dismissed based on a contradiction with their initial complaint (and their claims should not be), SPA-16, *Rodriguez's* claims may not be dismissed on that basis.

## II.     The District Court Erred By Relying On The December 2021 Coinbase User Agreement

The district court further erred in holding that the December 2021 version[2] of the Coinbase user agreement "checkmate[d] plaintiffs from adequately pleading" that Appellees directly sold and passed title to the Tokens. SPA-16. The December 2021 user agreement was not before the district court on the motion to dismiss, was not the relevant agreement that bound *any* Appellant (let alone all of them), and violates the Securities Act and the Exchange Act to the extent that it purports to bar Appellants from pleading claims under those statutes.

### A.     No Version Of The Coinbase User Agreement Was Before The District Court On The Motion To Dismiss

On a motion to dismiss, the district court may consider materials outside the complaint only if they are "incorporated by reference in the complaint" or "integral to the complaint." *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021) (internal quotation marks omitted). "For a document to be considered integral to the complaint, the plaintiff must rely on the terms and effect of a document in drafting the complaint. Mere notice or possession is not enough." *Id.* (cleaned up). Moreover, "it must be clear that there exist no material disputed issues of fact regarding the relevance of the document." *Id.* (internal quotation marks

---

[2] The district court erroneously referred to the December 2021 version as the "December 2020 version." SPA-13 n.5.

omitted). The mere fact that a document may be relevant to the ultimate merits of the litigation neither obligates the plaintiff to incorporate that document into the complaint nor authorizes the district court to consider it on a motion to dismiss. *See id.* at 108 ("If all that is required to render a document integral to the complaint is that it be favorable to the defendant, possibly thwarting the plaintiff's claims, it would be difficult to imagine a document that could not be considered on a motion to dismiss pursuant to the integral-to-the-complaint exception.").

As discussed above in Part I, the sole operative pleading before the district court was the Amended Complaint. *See Harris*, 186 F.3d at 249 (amended complaint "is the legally effective pleading for Rule 12(b)(6) purposes"). The district court's conclusion that the December 2021 user agreement was incorporated by reference and relied on in Oberlander's and Underwood's *initial* complaint, SPA-13-14, was thus irrelevant to the motion to dismiss the Amended Complaint. The pertinent question was instead whether the user agreement was incorporated by reference in or integral to the Amended Complaint. It was not.

The Amended Complaint does not mention, attach, or refer to any version of the user agreement. Nor is any version of the user agreement integral to the Amended Complaint. In drafting the Amended Complaint, Appellants did not "rely on the terms and effect of" the user agreement. *Foreman*, 19 F.4th at 106 (cleaned up). Rather, Appellants plainly allege that each individual transaction for the sale of a

37

Token on Coinbase is an unlawful sale of an unregistered security by Appellees, and that Appellees have acted as an unregistered exchange and broker-dealer through their participation in and facilitation of these transactions. A-999-1001 ¶¶ 909-16. All of this would be true regardless of whether the user agreement existed or not, and the district court therefore did not need to interpret any provision of the user agreement to determine Appellees' liability. Moreover, the contracts Appellants seek to rescind under Section 29(b) of the Exchange Act are not embodied in the user agreement or any provision thereof, but are the *individual purchase contracts* governing each sale of a Token by Appellees, which are distinct from the user agreement. *See* A-1011-12 ¶¶ 962-65; A-1014 ¶¶ 975-78; A-1015-17 ¶¶ 985-88; A-1018-20 ¶¶ 998-1001; *infra* Part III.B.

The district court therefore erred in finding that "the contractual obligations between Coinbase and plaintiffs—as set out in the [u]ser [a]greement—are central to" Appellants' claims for recission of unlawful contracts. SPA-14. Appellants did not "plead around" the user agreement "by refusing to make reference to it" in the Amended Complaint. SPA-15 (quoting *Van Houtven v. Adams*, 2014 WL 1338066, at *2 (S.D.N.Y. Apr. 3, 2014)). The total *irrelevance* of the user agreement to Appellants' case theory meant there was nothing to "plead around." *Id.* Because no version of the user agreement has any bearing on the claims in the Amended Complaint, it is not integral to the Amended Complaint. *See Foreman*, 19 F.4th at

38

108 (holding that district court erred by relying on government report on motion to dismiss because, "[i]n contrast to other documents that we have found to be integral to a complaint," the report "was not alluded to, and did not form the basis for, the allegations or claims in the Complaint"); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 154 (2d Cir. 2002) (on motion to dismiss amended complaint, district court could not rely on collective bargaining agreement that "plaintiffs apparently did not rely on" in drafting amended complaint).

Even if the December 2021 user agreement were arguably integral to the Amended Complaint, the district court's reliance on it would still be improper because it was not "clear that there exist no material disputed issues of fact regarding the relevance of the document." *Foreman*, 19 F.4th at 106 (cleaned up). As detailed below in Part II.B, Appellants *dispute* that they ever agreed to be bound by the December 2021 user agreement. *See* Dist. Ct. ECF No. 25, at 2 n.1 (Jan. 28, 2022) (Appellants' preliminary injunction brief, stating they "[did] not concede that the current version or any prior version [of the user agreement] is enforceable or was validly entered into by Plaintiffs or the putative Class."). That issue turns on factual questions that may be disputed if this case proceeds, including whether Appellees provided notice to Appellants of the December 2021 update to the Coinbase user

agreement, as would be required under California law.[3] *See Rodman v. Safeway, Inc.*, 694 F. App'x 612, 613 (9th Cir. 2017) (rejecting argument that "a merchant may modify a consumer contract and bind the consumer *without any form of notice*" under California law (emphasis added) (citing, *inter alia*, *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal. App. 3d 987, 993 (1972))). The district court could not properly rely at the pleading stage on a purported contract where "the parties disagree as to whether and how [it] relate[s] to or affect[s] the contractual relationships" between them. *Chambers*, 282 F.3d at 154.

The district court further erred by finding that Appellants placed the December 2021 version of the user agreement before the court *for purposes of a motion to dismiss* by citing it in an earlier motion for emergency injunctive relief, which was filed *before* the Amended Complaint. It is well-established that "evidence produced on application for a preliminary injunction may not be considered" on a motion to dismiss. *Exch. Nat'l Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1130 (2d Cir. 1976) (quoting *Land v. Dollar*, 330 U.S. 731, 735 n.4 (1947)). The district court improperly did just that.

---

[3] Each version of the Coinbase user agreement contains a California choice-of-law provision. Courts sitting in New York "will generally enforce choice-of-law clauses." *AEI Life LLC v. Lincoln Benefit Life Co.*, 892 F.3d 126, 132 (2d Cir. 2018) (quoting *Ministers & Missionaries Benefit Bd. v. Snow*, 26 N.Y.3d 466, 470 (2015)).

40

On January 25, 2022, three months after the initial complaint was filed and the same day the district court scheduled a deadline for the filing of an amended complaint, Appellees attempted to impede this litigation by demanding, on pain of account termination, that Appellants and members of the proposed class accept a new arbitration agreement that would apply retroactively (including to this case), waive users' right to sue on a class-wide basis, shift legal fees to the movant following a successful motion to compel arbitration, and force any non-arbitrable claims to be litigated only in California. *See* Dist. Ct. ECF No. 25, at 2-3 (Jan. 28, 2022) (Appellants' preliminary injunction brief below, citing Dist Ct. ECF No. 26-2, App'x 5 ¶¶ 1.3, 1.7). In moving to enjoin this abusive and unconscionable tactic, Appellants (prior to filing the Amended Complaint) cited the December 2021 user agreement because it was plainly relevant to show that Appellees' January 2022 proposed terms were significantly more punitive, one-sided, and intended to deter litigation, and therefore were unconscionable. *See id.* at 2 n.1. Appellants expressly stated that they did "not concede that the current version or any prior version [of the user agreement was] enforceable" against them or the putative class. *Id*. Rather, Appellants cited the December 2021 user agreement in their application for preliminary injunctive relief because Appellees' proposed changes to it were relevant to the arbitrability of this dispute, but not to the merits of the underlying claims.

41

In resolving the application for emergency injunctive relief, the district court did not make *any* findings as to the legal effect of *any* terms in the user agreement. Instead, the parties stipulated, and the district court then so-ordered, that Appellees would not apply to this action their recent changes to the user agreement's dispute resolution provisions, and Appellants agreed to withdraw their application for emergency relief. A-730-31. Thus, the district court's ruling that Appellants "asserted the primacy" of the December 2021 user agreement, SPA-15, not only misapplied governing law but entirely misconstrued the record before it.

### B. Appellants Never Accepted The December 2021 Coinbase User Agreement On Which The District Court Relied

Even if the December 2021 user agreement were within the "narrow universe of materials" the district court could consider on a motion to dismiss (and it is not), *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016), it would be irrelevant because no Appellant is bound by it.

To begin, even if Underwood's and Oberlander's initial complaint were the operative pleading—and it is not, *see supra* Part I—nothing in that complaint conceded that Underwood or Oberlander is bound by the December 2021 user agreement. The district court quoted the initial complaint's allegation that "Coinbase entered into contracts via the Coinbase [u]ser [a]greement, with Plaintiffs and the members of the Class and Subclasses," SPA-14 n.5 (quoting A-854 ¶ 273) (emphasis removed), but that allegation does not address *which version* of the Coinbase user

42

agreement bound Underwood or Oberlander—much less Rodriguez, who was not a plaintiff in the initial complaint.

In reality, the December 2021 user agreement was not the binding agreement for any Appellant. Rather, each Appellant began using Coinbase well before the December 2021 user agreement existed. As Appellees acknowledged in their briefing below, Underwood and Oberlander started using Coinbase in December 2017 and were offered a version of the user agreement that had taken effect in September 2017. *See* Dist. Ct. ECF No. 59, at 5 (May 10, 2022). Rodriguez started using Coinbase in March 2020 and was offered the December 2019 version of the user agreement. *See* Dist. Ct. ECF No. 35, at ¶ 4 (Feb. 3, 2022); Dist. Ct. ECF No. 35-1 (Feb. 3, 2022) (schedule of user agreements).

While the district court described the user agreements presented to Appellants as containing "substantially similar relevant language" to the December 2021 version, SPA-14 n.5, they are in fact—as Plaintiffs argued in their application for preliminary injunctive relief—dramatically different. The September 2017 version offered to Underwood and Oberlander, A-546-78, contained *none* of the language from the December 2021 version on which the district court relied in granting the motion to dismiss, including the statements that "[w]hen you purchase (buy) or sell Digital Currency on the Coinbase Site, you are not buying Digital Currency from Coinbase or selling Digital Currency to Coinbase" and that "[t]itle to Digital

Currency shall at all times remain with you and shall not transfer to Coinbase."
SPA-15-16; A-1047 § 2.6.1; A-1048 § 3.2. And the December 2019 version offered
to Rodriguez—unlike the December 2021 version—explicitly stated that a sale of
digital assets on Coinbase *is* a purchase from Coinbase: "When you purchase (buy)
Digital Currency ***from Coinbase*** (or from a third-party using Coinbase Pro) this
transaction is ***intended to effect a sale*** of Digital Currency." A-702 § 3.2 (emphases
added). Thus, the earlier version of the user agreement offered to Rodriguez directly
*supported* his claim that the Coinbase Exchanges were in privity with him for each
of his purchases.

No Appellant has affirmatively assented to any change to his user agreement
after signing up for Coinbase. To the extent Appellees argue that Appellants are
bound by the December 2021 version of the Coinbase user agreement through
unilateral "updates" by Appellees, that is wrong. Under California law, which
governs the user agreement by its express terms, Appellees' unilateral attempts to
update their contracts fail on both procedural and substantive grounds.

Procedurally, a party to an adhesive consumer contract governed by California
law cannot unilaterally "update" the contract without notice to the consumer, even
if the contract purports to reserve the right to do so. *See Rodman*, 694 F. App'x at
613 ("Safeway cites no authority from California law suggesting that a merchant
may modify a consumer contract and bind the consumer without any form of notice.

44

What authority does exist counsels that California would not enforce a modification without notice."). The district court cited no evidence (and none was before the district court) that Appellees provided any notice to existing users of the updates introducing the contractual language on which the district court relied.

Substantively, these unilateral updates to contracts with existing users are unreasonable as a matter of California law. A party that reserves the unilateral right to change a contract must exercise that right in an "objectively reasonable" manner, which means it may not "attempt[] to 'recapture' a forgone opportunity by adding an entirely new term which has no bearing on any subject, issue, right, or obligation addressed in the original contract and which was not within the reasonable contemplation of the parties when the contract was entered into." *Badie v. Bank of Am.*, 67 Cal. App. 4th 779, 796 (1998) (citation omitted) (declining to enforce arbitration clause unilaterally added to terms of use). Coinbase's attempt to turn itself into a non-seller by pure *ipse dixit* in a disputed user agreement would be a change "not within the reasonable contemplation of the parties when the contract was entered into," *id.*, and therefore not a change Coinbase could unilaterally impose on its users. Indeed, it is hard to think of a more abusive unilateral change than one that adds inaccurate "facts" to a user agreement so that a corporation can later rely on those purported facts to "checkmate" its users in litigation. SPA-16.

If this Court reaches the question of whether Appellants are bound by the December 2021 user agreement,[4] it should hold that they are not.

### C. The District Court's Reliance On The Coinbase User Agreement Effectively Turns That Agreement Into An Illegal Waiver Of Securities Claims

The district court's holding that the user agreement precluded Appellants from pleading the key facts supporting their direct-seller theory under Section 12(a)(1) of the Securities Act, SPA-16, was erroneous for the additional reason that it in effect turned the user agreement into a waiver of liability.

The Securities Act contains an express anti-waiver provision stating that "[a]ny condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter or of the rules and regulations of the [SEC] *shall be void*." 15 U.S.C. § 77n (emphasis added). The Exchange Act contains a substantially similar anti-waiver provision. *See* 15 U.S.C. § 78cc(a). Without mentioning either provision,[5] the district court held that "the facts pled in the Complaint and contained in the [u]ser [a]greement … *checkmate*

---

[4] The Court need not reach this question because the operative pleading, the Amended Complaint, does not reference or rely on any version of the user agreement. *See supra* Part II.A.

[5] Appellants raised the anti-waiver provisions in their opposition to Appellees' motion to dismiss the Amended Complaint, Dist. Ct. ECF No. 62, at 15-16, but the district court failed to address the argument.

46

*plaintiffs* from adequately pleading the first prong of Pinter's statutory seller inquiry." SPA-16 (emphasis added). In other words, the district court concluded that Appellants waived their right to allege the factual predicates of their Securities Act claims by entering into the Coinbase user agreement, thus effectively shielding Appellees from liability.

Such back-door waivers are prohibited. For example, in *McMahan & Co. v. Wherehouse Ent., Inc.*, 65 F.3d 1044 (2d Cir. 1995), this Court held that a contractual provision purporting to establish "a procedure that must be followed before an action may be brought" could not be enforced to bar investors' federal securities claims. 65 F.3d at 1050-51. Despite lacking an express waiver, the pre-suit procedure provision could "operate to bar a minority plaintiff class from exercising its substantive rights under federal securities law" because it required the plaintiffs to win a vote among investors and to "indemnify the Trustee," which they might be unable to do. *Id.* at 1051. Here, the user agreement, as interpreted by the district court, would likewise "operate to bar [Appellants] from exercising [their] substantive rights under federal securities law." *Id.* Such a result would violate the Securities Act. For that reason as well, the district court erred by relying on the user agreement to dismiss Plaintiffs' claims.

### III. Appellants Plead Violations of Federal and State Securities Laws

The Amended Complaint adequately states claims for primary liability under Section 12(a)(1) of the Securities Act and Section 29(b) of the Exchange Act, controlling person liability under Section 15 of the Securities Act and Section 20 of the Exchange Act, and violations of the securities laws of California, Florida, and New Jersey.

### A. Appellants Plead a Claim Under Section 12(a)(1)

Section 12(a)(1) of the Securities Act imposes strict liability on any statutory seller of an unregistered security. 15 U.S.C § 77*l*(a)(1). A statutory seller is either (1) the "owner who passed title, or other interest in the security, to the buyer," or (2) one who "successfully solicit[ed] the purchase [of a security], motivated at least in part by a desire to serve his own financial interests or those of the securities' owner." *Pinter v. Dahl*, 486 U.S. 622, 642, 647 (1988). Either prong of *Pinter* is independently sufficient to state a claim, *id.*, and Appellants adequately plead both prongs of *Pinter*.

*First*, the district court itself acknowledged that the Amended Complaint's allegations "would ordinarily assist [Appellants] in pleading" that Appellees are liable under Section 12(a)(1) as direct sellers. SPA-12. Specifically, the Amended Complaint alleges that the only blockchain address with which a customer ever interacts is the wallet deposit address provided by Coinbase that Coinbase owns. A-

48

795 ¶ 32. No Token ever flows from one Coinbase user to another user. *Id.* If Trader

A deposits Bitcoin in his Coinbase account, exchanges that Bitcoin for a Token sold

on Coinbase, and then withdraws the Token from Coinbase's wallet, the blockchain

will show two parties: Trader A and Coinbase. *Id.* The fact that Coinbase may have

set the listing price for that Token based on a different transaction made by another

user is irrelevant to Trader A—Trader A never interacts with that other user, sends

no asset to the other user, receives no asset from the other user, and has no

blockchain-recorded interaction with the other user. Trader A's only counterparty

on the blockchain, and the only entity with which Trader A could possibly be in

privity, is Coinbase. *Id.*

Moreover, Coinbase "place[s] all deposited assets into a centralized wallet,"

A-796 ¶ 34, thereby controlling the title to all the digital assets, and "[c]ustomers on

Coinbase transact *solely with Coinbase itself*," A-1006 ¶ 936. It is well-established

that, when assets are transferred to a central depository (here, Coinbase's centralized

wallet), title passes to the depository institution (here, Coinbase). *See, e.g.*, *Citizens*

*Bank of Maryland v. Strumpf*, 516 U.S. 16, 21 (1995) (holding that when individuals

deposits assets into bank accounts, those assets transfer to the bank and all the

depositor possesses is a promise that they will be repaid); *In re Bennett Funding*

*Grp., Inc.*, 146 F.3d 136, 139 (2d Cir. 1998) ("[W]hen a depositor deposits funds

into a general account he parts with title to the funds in exchange for a debt owed to

him by the bank[.]"); *Anderson v. Farmers' Loan & Tr. Co.*, 241 F. 322, 324 (2d Cir. 1917) ("Deposits are not the property of the depositors, but of the trust company.").

The Amended Complaint's allegations that Appellees controlled title to the Tokens through their centralized wallet and directly participated in every transaction are sufficient to plead their status as direct sellers under the first prong of *Pinter*.

*Second*, the Amended Complaint adequately pleads the second independent *Pinter* prong: that Appellees "successfully solicit[ed] the purchase [of the Tokens], motivated at least in part by a desire to serve [their] own financial interests or those of the securities owner." *Pinter*, 486 U.S. at 647; *see also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 50 (2d Cir. 1991) ("Section 12 liability has since the enactment of the Securities Act been applied to brokers and others who solicit securities purchases on a regular basis."). Here, Appellants allege that "Coinbase Platform users can place orders to buy, sell, or exchange digital assets at the digital assets' market price *as displayed on the Coinbase Platform* at the time of placement of the order." A-796 ¶ 35 (emphasis added). At the pleading stage, it is at least a plausible inference that Appellees' calculated decision to provide such real-time pricing data in connection with each trade on their platform is "motivated at least in part by a desire to serve [Appellees'] own financial interests," *Pinter*, 486 U.S. at 647, by inviting and persuading users to purchase Tokens at the advertised prices

50

and thereby earning fees from each transaction. *E.g.*, A-796-98 ¶¶ 36-40; A-999 ¶ 911; A-1006-07 ¶ 937; A-1011 ¶ 962; A-1012-13 ¶ 969; A-1014 ¶ 975; A-1015-16 ¶ 985; A-1017 ¶ 992; A-1018-19 ¶ 998; A-1020-21 ¶ 1006.

Additionally, Appellants allege that Appellees provide users with descriptions of each Token and its purported value proposition, conduct direct promotions involving distribution of free Tokens, write news updates on price movements of the Tokens, and link to articles about the Tokens published across the internet—all to facilitate and encourage trades in Tokens. *See* A-999 ¶ 911. These facts, taken together with the fact that Appellees actively provide real-time pricing in connection with the trades on their platforms, substantiate the allegation—and certainly support a plausible inference at the pleading stage—that Coinbase directly solicited trades of the Tokens motivated at least in part by a desire to serve its own financial interests predicated on fees and other compensation earned through users' trading activity.

The district court's erroneous finding that Coinbase's participation in selling the Tokens was merely "collateral" rests on a misinterpretation of the relevant caselaw. SPA-18-19 (citing, *inter alia*, *Wilson v. Saintine Expl. & Drilling Cmp.*, 872 F.2d 1124 (2d Cir. 1989); *Youngers v. Virtus Inv. Partners, Inc.,* 195 F. Supp. 3d 499 (S.D.N.Y. 2016)). *Wilson* held that a party whose "participation in the sale consisted solely of the ministerial act of mailing a copy of the private placement memorandum" was not a statutory seller. 872 F.2d at 1126. Such "ministerial"

51

conduct*, id.*, is a far cry from Appellees' solicitations, including their choice to advertise real-time pricing data for each Token, which directly facilitated and encouraged each trade. Moreover, *Wilson* expressly recognized that statutory sellers could include those who "earn a commission … for persuading their clients to make a particular investment," as Appellees do through their transaction fees. *Id.* at 1127. Similarly, the district court in *Youngers* acknowledged that "indirect solicitation can suffice to state a claim" but found that a mere allegation that defendants "distributed … marketing materials through their website and other channels" was insufficient. 195 F. Supp. 3d at 522 (internal quotation marks omitted). None of the district court's cited cases, SPA-18-19, concerned a defendant's communication of real-time pricing data or other forms of solicitation comparable to what Appellants allege here, which goes far beyond merely distributing marketing materials.

The district court also erred in holding that Appellants failed to "plead that [they] purchased and sold the Tokens *as a result of* [Appellees'] solicitation, as also required." SPA-19 (emphasis added) (citing *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001)). Section 12(a)(1) does not require Appellants to plead or prove reliance on Appellees' solicitation. *See Pinter*, 486 U.S. at 652 ("[N]o congressional intent to incorporate tort law doctrines of reliance and causation into § 12[(a)](1) emerges from the language or the legislative history of the statute. Indeed, the strict liability nature of the statutory cause of action

52

suggests the opposite."). In any event, to the extent Appellants must plausibly allege some nexus between their purchases and Appellees' actions, they have done so by alleging that Appellants and Class members purchased Tokens at the "market price *as displayed on the Coinbase Platform* at the time of placement of the order," which supports a more than plausible inference that the subsequent purchases directly resulted from the display of such pricing data. A-796 ¶ 35 (emphasis added).[6]

## B. Appellants Plead A Claim Under Section 29(b)

Section 29(b) confers a right to rescind contracts made in violation of the Exchange Act's provisions. 15 U.S.C. § 78cc(b); *Boguslavsky v. Kaplan*, 159 F.3d 715, 722 (2d Cir. 1998). To state a claim, a plaintiff must "show that (1) the contract involved a prohibited transaction, (2) he is in contractual privity with the defendant, and (3) he is in the class of persons the [Exchange] Act was designed to protect." *Pompano-Windy City Partners, Ltd. v. Bear Stearns & Co.*, 794 F. Supp. 1265, 1288 (S.D.N.Y. 1992) (cleaned up). Appellees did not dispute the second or third elements in their briefing below, and the decision below rested entirely on the district court's erroneous conclusion that Appellants failed to plead the first element. SPA-20-23.

The district court erred in concluding that Appellants did not "identify any transaction-specific contract." SPA-22. But Appellants expressly allege that "[e]ach

---

[6] As noted above, Plaintiffs' solicitation allegations are legally independent of their direct seller claims under Section 12(a)(1).

transaction in a Token on the Coinbase Exchanges constitutes a contract between Coinbase and a Plaintiff or Class member," *e.g.*, A-1011 ¶ 962, and that each such contract necessarily violated both the registration requirements of Section 5 because they "could not be performed unless Coinbase continued its practice of operating an unregistered exchange that brings together purchasers and sellers of Tokens," A-1011-12 ¶ 963; A-1016 ¶ 986, and Section 15(a)(1) because they required Coinbase "to continue its practice of operating as a broker, dealer, or both, despite not being registered as a broker or dealer," A-1014 ¶ 976; A-1019 ¶ 999.

Contrary to the district court's conclusion, SPA-22, each purchase or sale of a Token constitutes a separate contract. By way of analogy, it is well established in the retail context that a contract is formed at the moment a consumer buys a product. *See, e.g.*, *Garrett v. Tandy Corp.*, 295 F.3d 94, 100 & n.3 (1st Cir. 2002) ("Each time a customer takes an item off the shelf, a new contract looms[.]"); *Barker v. Allied Supermarket*, 596 P.2d 870, 871 (Okla. 1979) (collecting cases holding "that taking possession of goods from a self-service display coupled with the intent to pay for them is sufficient to create a … contract for their sale"). The mere existence of a *different* agreement between the parties (like a Costco membership or distributorship agreement) does not alter the hornbook principle that each individual purchase is pursuant to a distinct contract. *See Gallo Wine Distributors, L.L.C. v. Niebaum-Coppola Est. Winery, L.P.*, 56 F. App'x 8, 10 (2d Cir. 2003) (holding that individual

purchases by distributor were enforceable agreements "separate and distinct" from obligations under distribution agreement); *ECHO, Inc. v. Whitson Co.,* 52 F.3d 702, 705 (7th Cir. 1995) (similar); *see also Alessi Equip., Inc. v. Am. Piledriving Equip., Inc.*, 578 F. Supp. 3d 467, 508-09 (S.D.N.Y. 2022) (collecting cases).

The district court thus erred in concluding that "the only contract capable of rescission here under Section 29(b) is the User Agreement." SPA-22. *First*, as discussed above in Part II, no version of the user agreement was properly before the district court on the motion to dismiss the Amended Complaint. *Second*, even if the user agreement could have been considered (and it could not), the district court erroneously relied on inapposite cases for the proposition that the individual purchases were mere transactions under a lawful contract. In each case cited by the district court for this proposition, the *sole* contract between the plaintiff and defendant was a facially lawful contract for brokerage or investment services. *See Slomiak v. Bear Stearns & Co.,* 597 F. Supp. 676, 682-83 (S.D.N.Y. 1984); *In re Bernard L Madoff Inv. Sec., LLC*, 605 B.R. 570, 589, 591 n.11 (S.D.N.Y. 2019), *aff'd*, 830 F. App'x 669 (2d Cir. 2020); *Palmer v. Thomson & McKinnon Auchincloss, Inc.*, 474 F. Supp. 286, 291 (D. Conn. 1979). Thus, in those cases (unlike here), there was no illegal contract between the litigants to rescind. By contrast, the instant case seeks rescission *only* of the illegal contracts that governed each purchase.

To the extent Appellees argue there is no private right of action under Section 29(b)—a question the district court did not reach, SPA-21—they are mistaken. Numerous other circuits, as well as district courts in this Circuit, have squarely held a private right of action exists under Section 29(b). *See EdgePoint Cap. Holdings, LLC v. Apothecare Pharm., LLC*, 6 F.4th 50, 59 (1st Cir. 2021); *Regional Props., Inc. v. Fin. & Real Est. Consulting Co.*, 752 F.2d 178, 182 (5th Cir. 1985); *Western Fed. Corp. v. Erickson*, 739 F.2d 1439, 1443 n.5 (9th Cir. 1984); *NovaFund Advisors, LLC v. Capitala Group, LLC*, 2020 WL 230089, at *13 (D. Conn. Jan. 14, 2020); *Couldock & Bohan, Inc. v. Société Generale Sec. Corp.*, 93 F. Supp. 2d 220, 231 (D. Conn. 2000). The district court thus erred in dismissing Appellants' claims under Section 29(b).

## C. Appellants Plead Claims For Controlling Person Liability

The district court's dismissal of Appellants' claims for controlling person liability—asserted against Appellees Armstrong and Coinbase Global under Section 15 of the Securities Act and Section 20 of the Exchange Act—was based solely on the district court's erroneous dismissal of the primary claims. *See* SPA-19. Because Appellants adequately pleaded primary claims under the Securities Act and Exchange Act, reversal is warranted and the controlling person claims should be reinstated.

56

Substantively, Appellants have more than satisfied the test for controlling person liability, which is a functional one and does not depend on any specific legal relationship. *See SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1472-73 (2d Cir. 1996). The Amended Complaint alleges that Coinbase Global wholly owns Coinbase, Inc., exercises total control over it, and has the power to direct or cause the direction of its management and policies. *See* A-790 ¶ 11; A-1020-21 ¶¶ 1005-09. The Amended Complaint also alleges that both Coinbase defendants are "operated as one corporation" with a shared office—referred to in Defendants' own SEC filings by the collective phrase, the "Company." A-790 ¶ 11. As for Defendant Armstrong—the CEO of Coinbase Global—the Amended Complaint alleges that he had daily management responsibilities over both Coinbase defendants' operations—including "the decision not to register as a securities exchange or a broker-dealer and the decision to list unregistered securities." A-790 ¶ 12; *see also* A-1021-22 ¶ 1011-14. These allegations plausibly plead controlling person liability against both Coinbase Global and Armstrong.

### D. Appellants Plead Claims Under the Securities Laws of California, Florida, and New Jersey

The district court dismissed Appellants' state law claims based solely on the discretionary doctrine of supplemental jurisdiction under 28 U.S.C. § 1367(c)(3), SPA-24-25. This was error because the Amended Complaint does not invoke supplemental jurisdiction at all, but rather properly pleads original diversity

57

jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), A-790 ¶ 13, which Appellees did not challenge. In any event, Appellants' state law claims are adequately pleaded for the same reasons as the federal claims, because the applicable state laws are generally interpreted in line with their federal analogs. *See Viterbi v. Wasserman*, 191 Cal. App. 4th 927, 937 (2011); *Rushing v. Wells Fargo Bank, N.A.*, 752 F. Supp. 2d 1254, 1260 (M.D. Fla. 2010); *Riggs v. Schappell*, 939 F. Supp. 321, 324 n.2 (D.N.J. 1996).

In fact, certain of the state law claims are *broader* than their federal counterparts. Section 29(b) of the Exchange Act applies to "[e]very *contract* made in violation of any provision of [the Exchange Act]." 15 U.S.C. § 78cc(b) (emphasis added). By contrast, Appellants' state law claims apply to every *purchase* or *sale* of a security. *See* Cal. Corp. Code § 25501.5(a)(1) (permitting "an action for recission of the sale or purchase"); Fla. Stat. § 517.211(1) (permitting rescission of "every sale made in violation of" the registration provisions); N.J. Stat. § 49:3-71(c) (permitting "an action either at law or in equity to recover the consideration paid for the security"). Thus, even if the district court's erroneous conclusion that each purchase or sale of a Token did not amount to a contract subject to Section 29(b) were correct, SPA-22, the state claims would nonetheless survive since none of them requires that a "contract" exists—all that need exist is a "purchase" or "sale" of a security, which clearly occurred here.

58

Because the district court had no basis for dismissing Appellants' state law claims, over which the court had original jurisdiction, reversal is warranted.

## **CONCLUSION**

For the above reasons, Appellants respectfully request that this Court reverse the judgment of the district court granting Appellees' Motion to Dismiss, reinstate all dismissed claims, and remand to the district court.

Dated: May 25, 2023                                    Respectfully submitted,

SELENDY GAY ELSBERG PLLC           SILVER GOLUB & TEITELL LLP

/s/ Jordan A. Goldstein                          /s/ Steven L. Bloch
Jordan A. Goldstein                               Steven L. Bloch
1290 Avenue of the Americas, 17th Floor    One Landmark Square, 15th Floor
New York, New York 10104                     Stamford, Connecticut 06901
(212) 390-9000                                       (203) 325-4491

*Attorneys for Plaintiffs-Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel for Plaintiffs-Appellants certifies pursuant to Federal Rule of Appellate Procedure 32(g) that this principal brief:

1.      complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(e) and Local Rule 32.1(a)(4)(A) because it contains 13,865 words, including footnotes and excluding the parts of the brief exempted by Federal Rules of Appellate Procedure 32(f); and

2.      complies with the typeface and style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft Office 365 in 14-point Times New Roman.

Dated: May 25, 2023          */s/ Jordan A. Goldstein*

**SPECIAL APPENDIX**

i

## TABLE OF CONTENTS

**Page**

Opinion and Order of the Honorable Paul A. Engelmayer, dated February 1, 2023 Appealed From ........................................................................ SPA-1

Judgment, entered February 1, 2023 Appealed From ... SPA-28

SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CHRISTOPHER UNDERWOOD et al., *Individually and on Behalf of All Others Similarly Situated,*

Plaintiffs,

-v-

COINBASE GLOBAL, INC., COINBASE, INC., and BRIAN ARMSTRONG,

Defendants.

21 Civ. 8353 (PAE)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

This decision resolves a motion to dismiss a putative class action brought under the federal securities laws against defendants Coinbase Global, Inc., Coinbase, Inc., and Brian Armstrong ("Armstrong") (collectively with Coinbase Global, Inc., and Coinbase, Inc., "Coinbase" or "defendants").

Coinbase operates two online digital trading platforms on which users can transact in the cryptoeconomy. The Amended Complaint ("AC"), Dkt. 43, alleges that among the assets that Coinbase enables customers to buy and sell on these platforms are ones qualifying as securities. It alleges that these include 79 digital assets known as the "Tokens." It alleges that, notwithstanding Coinbase's practice of transacting in these securities with plaintiffs and other users, Coinbase is not registered with the U.S. Securities and Exchange Commission ("SEC") as an exchange or broker-dealer.

On this basis, lead plaintiffs here—each of whom transacted in the Tokens on the Coinbase platform—bring three sets of claims: (1) under Section 12(a)(1) of the Securities Act of 1933 (the "Securities Act"), for damages arising from Coinbase's sale or solicitation of

unregistered securities, AC ¶¶ 931–41; (2) under Section 29(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), arising from illegal contracts Coinbase entered into with its users to purchase and sell securities in violation of the Exchange Act's registration requirements, *id.* ¶¶ 956–88; and (3) under state law, based on Coinbase's sale of unregistered securities and failure to register as a broker-dealer, *id.* ¶¶ 1016–1106.  They also bring control-person claims against Coinbase Global and its Chief Executive Officer, Armstrong, who allegedly orchestrated Coinbase's strategy to profit by violating the securities laws, *id.* ¶¶ 942–55, 1002–15, 1038–49, 1094–1106.  These claims are brought on behalf of a nationwide class consisting of all persons or entities who transacted in the Tokens on the Coinbase trading platforms between October 8, 2019 and the AC's filing on March 11, 2022 (the "class period"), and of subclasses keyed to citizens of three states who so traded during that period.

Pending now is defendants' motion to dismiss the AC for failure to state a claim under Federal Rules of Civil Procedure 12(b)(6) and 8(a).  Dkt. 69.  For the reasons that follow, the Court grants in full the motion to dismiss.  The Court dismisses the federal claims with prejudice and the state claims without prejudice.

I.    **Background**

    A.    **Factual Background**[1]

        1.    **Crypto-Assets and Blockchains**

This case involves the modern financial concoctions known as crypto-assets.  Also sometimes called "cryptocurrencies," "tokens," or "crypto-securities," these are digital assets created and traded in the digital world.  AC ¶ 19.  Crypto-assets often rely on a technology

---

[1] The summary is drawn from the AC.  Dkt. 43.  For the purposes of resolving the motion to dismiss, the Court presumes all well-pled facts to be true and draws all reasonable inferences in favor of plaintiffs.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

known as "blockchain" to "secure transactions, control the creation of additional units, and verify their transfer." *See id.* Blockchain is a digital ledger system that tracks the ownership and transfer of different kinds of crypto-assets. *See id.* ¶¶ 20–21.

Users on the blockchain have a "public key" and a "private key." *See id.* ¶¶ 24–26. A user can publicly identify herself to other users with her "public key," which is akin to a conventional bank account number an individual might share with another who wishes to send the individual funds. *See id.* ¶¶ 24–25. A user also retains a "private key," which is akin to a pin code associated with the "bank account" public key. *See id.* The blockchain makes use of the public keys and unique addresses associated therewith to document transactions. *See id.* ¶¶ 20–21. For example, with the well-known crypto-asset known as "Bitcoin," "[a] transfer of Bitcoin is public to the extent that anyone can see the transferor's Bitcoin address, the recipient's Bitcoin address, and the quantity of assets transferred." *Id.* ¶ 27. By tracking who owns any given unit of a crypto-asset at any given time, the blockchain allows for the secure exchange of crypto-assets, enabling users to verify each transaction involving that particular unit. *Id.* ¶ 22. This system, by documenting ownership, aims to prevent counterfeiting. *Id.*

### 2. Crypto-Exchanges

The crypto-asset ecosystem depends on digital exchanges known as "crypto-exchanges." "Crypto-exchanges emerged to enable smoother and faster trading between investors, just as stock and commodities exchanges emerged to enable easy trading of securities." *Id.* ¶ 28. Crypto-exchanges come in two primary forms: decentralized and centralized. *Id.* ¶ 29.

Decentralized exchanges use different approaches. "[W]hat they have in common is that the crypto-assets are transferred between individual accounts." *Id.* ¶ 30. Such exchanges may be analogized to Craigslist.com, the website that allows users to match directly with other users to

enable individualized transactions. *See id.* ¶ 31. Decentralized exchanges, "like Craigslist, do not own or hold the assets in question—they simply provide a platform for exchanges between users, along with some features designed to facilitate trading (for example, Craigslist's creation and maintenance of message boards organized by product type or a decentralized exchange's smart contracts), possibly in exchange for advertising revenue or a transaction fee." *Id.*

Centralized exchanges play a more substantial role in transactions between individuals. First, a customer must "create an account" on the centralized exchange. *Id.* ¶ 32. "The exchange will then provide that customer with a deposit address that the exchange controls." *Id.* Then "[w]hen the customer deposits crypto-assets into that deposit address, the exchange will credit her trading account with the corresponding crypto-asset." *Id.* "The exchange will typically then transfer the crypto-assets into one of its other addresses for storage." *Id.* When that customer wants to make a transaction—say, to transfer one Bitcoin to the address of someone else—the centralized exchange "then debits the [customer's] account and transfers a corresponding amount of crypto-asset from the exchange's reserves to that address" of the user with whom he or she wishes to transact. *Id.* ¶ 42.

### 3.    The Coinbase Exchanges

Coinbase operates two digital asset trading exchanges: Coinbase (the "Coinbase Platform") and Coinbase Pro (the "Coinbase Pro Platform"). *Id.* ¶ 5. The Coinbase Platform is "marketed towards newer users," *id.* ¶ 35, and "allows users to place only market orders"— transactions of digital assets "at the digital assets' market price as displayed on the Coinbase Platform at the time of placement of the order," *id.* The Coinbase Pro Platform, in contrast, "is designed for use by advanced and active digital asset traders," *id.* ¶ 37. It "allows three types of orders: a market order, . . . a limit order to buy or sell a digital asset at a specific price or better,

4

**SPA-5**

or a stop order to buy or sell a digital asset if the market price of the digital asset falls to a specified price." *Id.*

The AC alleges that the Coinbase platforms operate as centralized exchanges. *Id.* ¶¶ 32, 34. Trades "do not in fact happen on the blockchain and do not actually involve the transfer of any assets between users. Instead, it is Coinbase that faces both the buyer and the seller." *Id.* ¶ 33. If two users wish to transact, each does so by transacting with Coinbase directly—not with each other. *Id.* "Thus, if [a customer] wishes to trade one Bitcoin for 10 Ethereum on Coinbase, Coinbase will update its internal records to debit [that customer's] account one Bitcoin and credit it 10 Ethereum; no actual crypto-assets are moved on the blockchain." *Id.* Customers are charged fees on both Coinbase platforms. *See id.* ¶¶ 34–40.

### 4. Coinbase's Alleged Failure to Register as a Securities Exchange or Broker-Dealer

The AC's central premise is that Coinbase lists and sells securities but is not registered as a securities exchange or as a broker-dealer. Plaintiffs purchased and sold the Tokens[2] on the Coinbase platforms during the Class Period,[3] *id.* ¶¶ 1, 918–19, during which neither Coinbase Platform was registered with the SEC as a securities exchange, *id.* ¶ 64; *see* 15 U.S.C. § 78c (registration requirements of "exchange" under Exchange Act), or broker-dealer, AC ¶ 64; *see* 15 U.S.C. § 78o(a)(1) (registration requirements for "brokers" and "dealers" under Exchange Act),

---

[2] Specifically, this action concerns the 79 digital assets traded under the following symbols: 1INCH, AAVE, ACH, ADA, AGLD, ALGO, AMP, ANKR, ARPA, ATOM, AUCTION, AXS, BAL, BAND, BAT, BNT, BOND, BTRST, CGLD, CLV, COMP, CRO, CRV, CTSI, CVC, DNT, DOGE, DOT, ENJ, EOS, FARM, FET, FIL, FORTH, GNT, GRT, GTC, ICP, IOTX, KEEP, KNC, LINK, LOOM, LRC, MANA, MATIC, MKR, MLN, NKN, NMR, NU, OGN, OMG, ORN, OXT, PLA, POLY, QNT, QUICK, RARI, REN, REP, RLC, SHIB, SKL, SNX, SOL, STORJ, SUSHI, TRB, TRIBE, UMA, UNI, XLM, XRP, XTZ, XYO, YFI, and ZRX (collectively, the "Tokens").

[3] For each Token, the AC alleges that at least one plaintiff has purchased or sold it during the Class Period. *See* AC ¶¶ 77–908.

SPA-6

nor "subject to exemptions from such registrations," AC ¶ 5.  "Because Coinbase brings together buy and sell orders for the Tokens[,] and the Tokens are securities," *id.*, the AC alleges, Coinbase "stands between the buyer and seller in each trade on its platform, meaning that is the actual seller of the unregistered securities that transact each day on its platform," *id.* ¶ 6.

### 5.  The Class Allegations

Plaintiffs bring this action as a putative class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3).  *Id.* ¶ 917.  Plaintiffs seek certification of a nationwide class defined as "all persons or entities who transacted in the Tokens on the Coinbase Platform and/or the Coinbase Pro Platform during the Class Period."  *Id.* ¶ 918.  Plaintiffs also seek certification of three subclasses: (1) "all persons or entities who transacted in the Tokens on a Coinbase platform during the Class Period while in the State of California"; (2) "all persons or entities who transacted in the Tokens on a Coinbase platform during the Class Period while in the State of Florida"; and (3) "all persons or entities who transacted in the Tokens on a Coinbase platform during the Class Period while in the State of New Jersey."  *Id.* ¶ 919.

### B.  Procedural History

On October 8, 2021, three plaintiffs—Christopher Underwood ("Underwood") of Florida, Louis Oberlander ("Oberlander") of California, and Zeneyda Patin of New York (collectively, the "original plaintiffs")—initiated this case by filing the Complaint, *see* Dkt. 1.  On October 12, 2021, counsel for the original plaintiffs published the requisite Private Securities Litigation Reform Act notice of this action through PR Newswire.  *See* Dkt. 18.

On December 13, 2021, two original plaintiffs—Underwood and Oberlander—along with a new plaintiff, Henry Rodriguez ("Rodriguez"), moved to be appointed lead plaintiffs.  Dkt. 15. On January 11, 2022, the Court granted an unopposed motion to name Underwood, Oberlander, and Rodriguez as lead plaintiffs and appoint Silver Golub & Teitell LLP and Selendy & Gay as

co-lead counsel. Dkt. 21. On January 28, 2022, plaintiffs moved for a temporary restraining order regarding amendments to Coinbase's user agreement that the original plaintiffs represented were to take place on January 31, 2022, and stood to affect the pending litigation. *See* Dkts. 24–26. On January 30, 2022, Coinbase opposed the motion, *see* Dkts. 28–30, to which the original plaintiffs replied that same day, *see* Dkts. 31–32.

On February 4, 2022, the Court held a hearing on the motion for injunctive relief. There, defendants agreed to drop any reliance on the new January 2022 dispute resolution provisions altogether for the purposes of this litigation, that is, as these provisions might apply to any named plaintiff or putative class member extant as of February 4, 2022. Such mooted plaintiffs' bid for emergency relief. *See* Dkt. 41 at 28–32 (hearing transcript). At the hearing, plaintiffs' counsel stated that plaintiffs intended to file an amended complaint with additional federal claims under the Securities Act. *See id.* at 34.

On February 7, 2022, the parties filed a proposed stipulation, Dkt. 38-1, that defendants would not seek to enforce alternative dispute resolution provisions of the user agreement against plaintiffs in this or any related action, *see id.* at 2, and the Court entered the stipulation, Dkt. 39.

On March 11, 2022, Underwood, Oberlander, and Rodriguez filed the AC. Dkt. 43. It changed plaintiffs' claims in nature and scope by, *inter alia*, (1) adding Coinbase, Inc. as a defendant; (2) adding to the digital assets within the scope of the lawsuit, in connection with the addition of Rodriguez as a named plaintiff; and (3) adding federal claims, including those relating to control-person liability, and state claims. *Compare* Dkt. 1, *with* AC.

On May 10, 2022, defendants moved to dismiss the AC in its entirety. *See* Dkts. 58–60. On July 11, 2022, plaintiffs filed an opposition. *See* Dkts. 62–63. On August 5, 2022, defendants replied. *See* Dkts. 67–68.

## II.      Legal Standards Governing the Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.  When resolving a motion to dismiss, the Court must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch*, 699 F.3d at 145.  That tenet, however, does not apply to legal conclusions. *See Iqbal*, 556 U.S. at 678.  Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## III.     Discussion

The Court first considers the AC's claims under the Securities Act, then those under the Exchange Act, and then its state-law claims.  Relevant to all is a single premise—that the Tokens are securities.  The AC alleges that each of the 79 Tokens is a security pursuant to the Securities Act, the Exchange Act, and the test articulated for "investment contracts" in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).  In support, the AC, for each Token, alleges that this digital asset has characteristics indicative of a security.  To this end, the AC alleges how the Token was introduced to the public; whether investors expected to receive profits from it; whether any marketing has been performed for it, and if so, by whom; which entities, if any, centrally manage it; and, during the Class Period, which plaintiffs engaged in "losing transactions" involving it. *See, e.g.*, AC ¶¶ 86–90 (for Token AAVE), 338–50 (for Token DOGE), 452–87 (for Token ICP).

SPA-9

Were this case to reach summary judgment, this contention would emerge as a central battleground. Defendants maintain that "[t]he Tokens are not 'securities,'" for reasons that, they state, "will become evident if this case proceeds." Dkt. 59 ("Defs. Mem.") at 1 n.2. However, defendants state, in light of other dispositive arguments—and presumably because whether the Tokens are securities presents a question of fact more suitably litigated at summary judgment— "the Court need not address this issue for purposes of this motion." *Id.* In the analysis that follows, the Court accordingly assumes *arguendo*, as do the parties in their briefing, that the Tokens are *bona fide* securities.

**A.      Claims Under the Securities Act**

The AC brings two claims under the Securities Act: in Count One, for the offer and sale of unregistered securities against Coinbase Global, Inc. and Coinbase, Inc., under Sections 5 and 12(a) of the Securities Act, *see* AC ¶¶ 931–42; *see also* 15 U.S.C. §§ 77e(a), 77e(c), 77*l*(a)(1); and, in Count Two, for control-person liability by Coinbase Global, Inc. and Brian Armstrong, under Section 15 of the Securities Act, based on the violations in Count One, *see* AC ¶¶ 942–55; *see also* 15 U.S.C. § 77o(a). Because Count Two is derivative of Count One, the Court addresses Count One first.

**1.      Allegations Relating to the Offer and Sale of Unregistered Securities**

*a.      Applicable Legal Standards*

Sections 5(a) and (c) of the Securities Act prohibit any person from selling unregistered securities using any means of interstate commerce unless the securities are exempt from registration. 15 U.S.C. § 77e(a), (c). To prove a violation of Section 5, the plaintiff must show that "(1) no registration statement was in effect for the securities at issue; (2) the defendant sold or offered the securities; and (3) interstate transportation, communication, or the mails were used

9

in connection with the offer or sale." *SEC v. Sason*, 433 F. Supp. 3d 496, 513 (S.D.N.Y. 2020). If the plaintiff meets this *prima facie* burden, the burden shifts to the defendant to show that an exception applies. *Id.* Section 5 is a strict liability statute that does not require a showing of scienter or negligence. *SEC v. Bronson*, 14 F. Supp. 3d 402, 408 (S.D.N.Y. 2014).

Section 12(a)(1) of the Securities Act creates a private right of action for the purchaser against the seller in any transaction that violates Sections 5(a) or (c). 15 U.S.C. § 77*l*(a)(1). It includes the right to sue for damages or rescission. *See, e.g.*, *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 137 (2d Cir. 2017) ("A buyer who retains ownership over the security may sue under Section 12 for equitable rescission, which limits recovery to 'the consideration paid for such security.'" (quoting 15 U.S.C. § 77*l*(a))). "[T]he list of potential defendants in a section 12(a)[(1)][4] case is governed by a judicial interpretation of section 12 known as the 'statutory seller' requirement." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010).

Under the Supreme Court's decision in *Pinter v. Dahl*, an individual is a "statutory seller" under either of two scenarios. 486 U.S. 622, 642, 647 (1988). First, liability attaches if the defendant "passed title, or other interest in the security, to the buyer for value"; such "imposes liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers. Thus, a buyer cannot recover against his seller's seller." *Id.* at 642, 644 n.21. Second, liability attaches if the defendant "successfully solicit[ed] the purchase [of a security], motivated at least in part by a desire to serve [its] own financial interests or those

---

[4] The Second Circuit has held that the identical language in Section 12(a)(2) has the same meaning, and therefore applies *Pinter* to Section 12(a)(1) and 12(a)(2) claims alike. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 49 (2d Cir. 1991); *Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir. 1988); *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, No. 00 Civ. 8058 (NRB), 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001).

of the securities' owner." *Id.* at 647; *see also In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 359.

In sum, plaintiffs may recover from defendants under Section 12(a)(1) only if: (1) defendants were the direct sellers of the Tokens to plaintiffs; or (2) defendants actively solicited the sale of the Tokens to plaintiffs and did so for financial gain. Defendants challenge the adequacy of the AC's pleadings under each theory.

> b. *Pinter's First Prong: Whether Coinbase Passed Title to the Tokens*

Plaintiffs argue that the AC adequately alleges that Coinbase is a statutory seller under *Pinter*'s first prong—that is, that Coinbase "passed title, or other interest" in the Tokens as the "immediate seller." *Pinter*, 486 U.S. at 642, 644 n.21. This theory pivots on the factual premise that Coinbase, as opposed to some other "selling" party, held title to the Tokens at the time of these transactions.

Relevant to this point, the AC alleges that Coinbase "place[s] all deposited assets into a centralized wallet," AC ¶ 34, thereby controlling the title to all the digital assets. As a result, it alleges, in every transaction involving these digital assets, "[t]he only blockchain address with which a customer ever interacts is the wallet deposit address provided by Coinbase itself and that Coinbase owns." Dkt. 62 ("Pl. Opp") at 6; *see* AC at 32. The AC thus posits that, in these transactions, Coinbase transacts with the user—as opposed to two users transacting with each other. "The buyer and seller are not in privity with one another," the AC alleges, AC ¶ 910; each instead is in privity with Coinbase. It alleges that a Coinbase user who wishes to make a transaction "never interacts with . . . [an]other user, sends no asset to the other user, receives no asset from the other user, and has no blockchain-recorded interaction with the other user." Pl.

Opp. at 6.  Based on the premise that "[c]ustomers on Coinbase transact *solely with Coinbase itself*," it alleges, "Coinbase is thus a seller of the Tokens."  AC ¶ 936 (emphasis added).

These allegations would ordinarily assist plaintiffs in pleading this theory.  But plaintiffs' bid is complicated because the AC's above allegations effectively repudiate diametrically contrary allegations in plaintiffs' original Complaint, in an apparent attempt to evade dismissal.

Ordinarily, an amended complaint "supersedes the original, and renders it of no legal effect."  *Dluhos v. Floating & Abandoned Vessel, Known as N.Y.*, 162 F.3d 63, 68 (2d Cir. 1998) (internal quotation marks omitted).  However, "where allegations in an amended pleading directly contradict pleadings in the original complaint, courts have disregarded the amended pleading."  *Wheeler v. Slanovec*, No. 16 Civ. 9065 (KMK), 2019 WL 2994193, at *6 (S.D.N.Y. July 9, 2019) (cleaned up); *see also Poindexter v. EMI Rec. Grp. Inc.*, No. 11 Civ. 559 (LTS) (JLC), 2012 WL 1027639, at *2 (S.D.N.Y. Mar. 27, 2012) ("[E]ven though the Amended Complaint is the operative pleading, the Court may still credit admissions in the original complaint and attached exhibits."); *Kilkenny v. L. Off. of Cushner & Garvey, L.L.P.*, No. 08 Civ. 588 (KMK), 2012 WL 1638326, at *5 (S.D.N.Y. May 8, 2012) ("[A] court may disregard amended pleadings when they directly contradict facts that have been alleged in prior pleadings.").  As the Second Circuit has put the point:  "A party . . . cannot advance one version of the facts in its pleadings, conclude that [his] interests would be better served by a different version, and amend its pleadings to incorporate that version, safe in the belief that the trier of fact will never learn of the change in stories."  *United States v. McKeon*, 738 F.2d 26, 31 (2d Cir. 1984); *cf. Andrews v. Metro N. Commuter R. Co.*, 882 F.2d 705, 707 (2d Cir. 1989) (district court's failure to permit jurors to examine original complaint, where amended complaint was in contradiction, was substantial abuse of discretion).

12

Such is the case here.  Although the AC casts Coinbase as the *only* counterparty to each transaction, *see* AC ¶¶ 6, 32–33, 910, 936, and as title holder to the Tokens, *see id.* ¶ 34, the Complaint painted a very different portrait of Coinbase, with factual allegations that undermine the AC's thesis that Coinbase was a statutory seller.  That is so in two respects.

*Privity*:  The Complaint's factual allegations directly contradict the AC's claim that privity existed only between Coinbase and users, and not between users for the purposes of any individual transaction.  It alleged that "[o]nce money or digital assets had been sent to the Coinbase Platform and credited to the wallet of a Coinbase Platform user, a Coinbase Platform [user] *can enter into trade agreements with other Coinbase Platform users for purchases and sales of digital assets*."  Compl. ¶ 27 (emphasis added); *see also id.* ¶ 32 (same allegation for Coinbase Pro platform).  This allegation is flatly opposite to the Amended Complaint's allegation that "[t]he buyer and seller are *not* in privity with one another," AC ¶ 33, and that "[c]ustomers on Coinbase transact *solely with Coinbase itself*," AC ¶ 936 (emphasis added).

*Title*:  The Complaint's factual allegations about *who* holds title to the Tokens also conflict with those in the AC.  The Complaint makes these allegations by referencing and incorporating the December 2020 version of the user agreement between Coinbase users and defendants, *see* Dkt. 26-3 (December 2020 version) (the "User Agreement").

That agreement is cognizable here for two reasons.[5]  First, the Complaint states that "Coinbase entered into contracts [with plaintiffs] via the Coinbase User Agreement . . . pursuant

---

[5] In briefing on the motion to dismiss, the parties dispute whether the User Agreement binds the three lead plaintiffs, inasmuch as the plaintiffs created accounts at different times in the years before this litigation, and defendants periodically updated and revised the user agreement.  *See* Pl. Opp. at 12–16; Dkt. 67 at 2–5.  In resolving the motion, the Court's charge is not to make a plaintiff-specific inquiry as to the operative agreement.  *See Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 113 (2d Cir. 2012).  The Court is instead to accept *plaintiffs*' well-pled allegations as true.  Here, the Complaint expressly references the User Agreement as covering the class period:

13

to which [p]laintiffs purchased Digital Asset Securities," Compl. ¶ 273, and asserts claims based

on this contractual relationship between plaintiffs and Coinbase, *see id.* ¶¶ 262–68. The User

Agreement is thus "incorporated by reference," *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104,

111 (2d Cir. 2010). Insofar as plaintiffs sought contractual recission of the transactions, the

contractual obligations between Coinbase and plaintiffs—as set out in the User Agreement—are

central to plaintiffs' claims in the Complaint, which "rel[ies] on the terms and effect of" the User

Agreement "in drafting the Complaint," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d

Cir. 2002). Second, the Court "may consider any written instrument attached to the complaint,

statements or documents incorporated into the complaint by reference, legally required public

disclosure documents filed with the SEC, and *documents possessed by or known to the plaintiff*

*and upon which it relied in bringing the suit.*" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493

F.3d 87, 98 (2d Cir. 2007) (emphasis added); *see Sun Micro Med. Techs. Corp. v. Passport*

*Health Commc'ns, Inc.*, No. 06 Civ. 2083 (RWS), 2007 WL 2230082, at *3 (S.D.N.Y. Aug. 2,

---

> *During the Class Period, Coinbase entered into contracts* with issuers of Digital
> Asset Securities Coinbase and made available for sale the issuer's Digital Asset
> Securities on Coinbase's unregistered exchanges, in violation of Section 5 of the
> Exchange Act. Additionally, *Coinbase entered into contracts via the Coinbase*
> *User Agreement*, with Plaintiffs and the members of the Class and Subclasses,
> pursuant to which Plaintiffs purchased Digital Asset Securities through Coinbase
> and paid Coinbase fees for the use of its securities exchanges despite their lack of
> registration with the SEC in violation of section 5 of the Exchange Act.

Compl. ¶¶ 272–73 (emphases added). The AC again eludes these issues, by eliminating all
references to the User Agreement. And insofar as plaintiffs argue that considering the Complaint
and User Agreement would unfairly injure Rodriguez, the new plaintiff the AC added to succeed
an earlier plaintiff, that is wrong, as plaintiffs do not—and cannot—dispute that the plaintiff
added by the AC "ha[d] his interests adequately represented by someone with the same interests
who [was] a party." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 846 (1999). The Court therefore
considers the December 2020 User Agreement in effect during the Class Period, as cited in the
Complaint. The predecessor versions contain substantially similar relevant language. *See, e.g.*,
Dkt. 35-16 (January 2019 user agreement version).

2007) ("When ruling on a motion to dismiss, the Court may take judicial notice of . . . items in the record of the case."). The User Agreement was put on the case record *by plaintiffs*, soon after they filed the Complaint, in seeking emergency relief. *See* Dkt. 26; *see also Avila v. Comm'r of Soc. Sec.*, No. 15 Civ. 2456 (JGK), 2016 WL 1562944, at *1 (S.D.N.Y. Apr. 18, 2016). They sought to enjoin defendants from enforcing an updated user agreement against plaintiffs with respect to its dispute resolution provisions, which directed disputes of this nature to mandatory arbitration. *See* Dkt. 38-1. In so doing, plaintiffs asserted the primacy of the pre-January 31, 2022 user agreement (that is, the agreement from December 20, 2020). Plaintiffs thus both "possessed," *ATSI Commc'ns, Inc.*, 493 F.3d at 98, that agreement, *see* Dkt. 26-3, and "relied [on it] in bringing the suit" in this Court, *ATSI Commc'ns, Inc.*, 493 F.3d at 98. They "cannot plead around it by refusing to make reference to it" in the AC. *Van Houtven v. Adams*, No. 13 Civ. 1964 (CM), 2014 WL 1338066, at *2 (S.D.N.Y. Apr. 3, 2014), *aff'd*, 605 F. App'x 37 (2d Cir. 2015).

The User Agreement's terms flatly contradict the AC's allegations that Coinbase holds title to the digital assets. The User Agreement—in language directed to the user—states that "[t]itle to Digital Currency shall at all times remain with you and shall not transfer to Coinbase." User Agreement § 2.6.1. It adds: "You control the Digital Currencies held in your Digital Currency Wallet." *Id.* § 2.6.2.

The User Agreement also reinforces the Complaint's pleading that, by using Coinbase, the user does not transact directly with, or pass title to or from, a Coinbase entity when they purchase a Token. It states: "When you purchase (buy) or sell Digital Currency on the Coinbase Site, you are not buying Digital Currency from Coinbase or selling Digital Currency to Coinbase.

SPA-16

Coinbase acts as the agent, transacting on your behalf, to facilitate that purchase or sale between you and other Coinbase [Inc.] customers." *Id.* § 3.2.

For these reasons, the Court need not, and does not, accept the AC's contrary allegations, which unavoidably emerge as strategically added to elude the facts pled in the Complaint and contained in the User Agreement that checkmate plaintiffs from adequately pleading the first prong of *Pinter*'s statutory seller inquiry. "While the Court must accept the facts as alleged in the complaint, when any allegations contradict the evidence contained in the document[] relied upon by . . . plaintiff[s], the document[] control[s], and the Court need not accept the allegations contained within the complaint as true." *Trahan v. Lazar*, 457 F. Supp. 3d 323, 341 (S.D.N.Y. 2020) (internal quotations omitted). And "where allegations in an amended pleading directly contradict pleadings in the original complaint, courts have disregarded the amended pleading." *Wheeler*, 2019 WL 2994193, at *6 (cleaned up). The Court therefore declines to credit the AC's allegations as to privity and title.

Without these allegations, the AC fails to plead the first prong of *Pinter*'s statutory seller inquiry. The Court cannot credit the AC's allegations that privity was solely between defendants and plaintiffs for each of the transactions at issue, nor can it credit the AC's allegations to the effect that defendants, as opposed to the sellers, held title to the assets that were the subjects of these transactions. Such is clear, in fact, from a recent on-point decision from this District, resolving a motion to dismiss a complaint against a cryptocurrency digital exchange alleged to be a Section 12 statutory seller. That decision, by Judge Carter, resolved a motion to dismiss on a similar theory, litigated during the period spanning the filing of the AC here. *See Anderson v. Binance*, No. 20 Civ. 2803 (ALC), 2022 WL 976824, at *3 n.2 (S.D.N.Y. Mar. 31, 2022). In the pertinent part of the analysis in *Binance*, Judge Carter rejected the theory that a digital exchange

16

was a "statutory seller[] because [it] passed title to Plaintiffs," noting that the complaint's factual allegations did not support this assertion. The same is so here.

The Court accordingly—holding plaintiffs to the allegations in their Complaint and to the provisions of the User Agreement that the Complaint incorporates—holds that plaintiffs have not pled that Coinbase either qualified as the user's "immediate seller," *Pinter*, 486 U.S. at 642, or "passed title, or other interest in the security, to the buyer for value," *id.* at 644 n.21. Because "remote purchasers are precluded from bringing actions against remote sellers" and "a buyer cannot recover against his seller's seller," *id.*, the AC fails *Pinter*'s first requirement.

        c.    *Pinter's Second Prong: Whether Coinbase*
                *Solicited the Transactions*

Plaintiffs argue that the AC adequately alleges that Coinbase solicited plaintiffs' purchases of the Tokens. *See* Pl. Opp. at 17. In *Pinter*, the Supreme Court narrowly construed "solicitation" under the Securities Act, mindful that "Congress did not intend to impose rescission based on strict liability on a person who urges the purchase but whose motivation is solely to benefit the buyer." *Pinter*, 486 U.S. at 647. The Court reasoned: "When a person who urges another to make a securities purchase acts merely to assist the buyer, not only is it uncommon to say that the buyer 'purchased' from him, but it is also strained to describe the giving of gratuitous advice, even strongly or enthusiastically, as 'soliciting.'" *Id.*

To hold a defendant liable under Section 12 as a seller, a purchaser such as plaintiffs must, therefore, demonstrate its direct and active participation in the solicitation of the immediate sale. *See, e.g.*, *Capri*, 856 F.2d at 478–79 (plaintiffs must show that the particular defendant actually solicited their investment); *Holsworth v. BProtocol Found.*, No. 20 Civ. 2810 (AKH), 2021 WL 706549, at *3 (S.D.N.Y. Feb. 22, 2021) (dismissing Section 12 claim where plaintiff failed to allege that he "was directly contacted by Defendants or that he purchased

securities as a result of any active solicitations by Defendants"); *Alpha Cap. Anstalt v. Intellipharmaceutics Int'l Inc.*, No. 19 Civ. 9270 (DLC), 2020 WL 3318029, at *4 (S.D.N.Y. June 18, 2020) ("[P]laintiffs must show that [defendant] actually solicited their investment."); *Griffin v. PaineWebber, Inc.*, No. 99 Civ. 2292 (VM), 2001 WL 740764, at *2 (S.D.N.Y. June 29, 2001) ("[Plaintiff] must allege not only that [defendant] actively solicited investors with respect to this transaction but that he purchased securities as a result of [the] solicitation.").

Measured against that standard, the AC's allegations regarding Coinbase's "solicitation" of the transactions involving the Tokens fail, because they do not describe conduct beyond the "collateral" participation that *Pinter* and its progeny exclude from Section 12 liability. *Wilson v. Saintine Expl. & Drilling Corp.*, 872 F.2d 1124, 1125 (2d Cir. 1989) ("[C]ollateral participants who do not solicit sales cannot be liable under Section 12(1) . . . ."). The AC alleges that Coinbase was an exchange that "promote[d] the sale of Tokens by providing users with descriptions of each Token and its purported value proposition," AC ¶ 911; "participated in direct promotions, including 'airdrops' of free Tokens designed to increase trading volume," *id.*; "wr[ote] news updates on price movements of the Tokens," *id.*; and "link[ed] to stories about the Tokens published across the internet," *id.* These activities of an exchange are of a piece with the marketing efforts, "materials," and "services" that courts, applying *Pinter*'s second prong, have held insufficient to establish active solicitation by a defendant. *See Youngers v. Virtus Investment Partners, Inc.*, 195 F. Supp. 3d 499, 522 (S.D.N.Y. 2016); *see also In re Thornburg Mortg., Inc. Sec. Litig.*, 695 F. Supp. 2d 1165, 1220 (D.N.M. 2010), *on reconsideration in part*, 824 F. Supp. 2d 1214 (D.N.M. 2011), *aff'd sub nom. Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190 (10th Cir. 2013); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003); *In re Tezos Secs. Litig.*, No. 17 Civ. 6779 (RS), 2018 WL 4293341, at *3 (N.D. Cal. Aug. 7, 2018);

*Me. State Ret. Sys. v. Countrywide Fin. Corp.*, No. 10 Civ. 0302 (MRP), 2011 WL 4389689, at *10 (C.D. Cal. May 5, 2011).

And even had the AC pled direct solicitation by Coinbase, it does not plead that plaintiffs purchased and sold the Tokens as a result of such solicitation, as also required. *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, No. 00 Civ. 8058 (NRB), 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001) (dismissing claim where plaintiff "failed to allege that plaintiff in fact purchased the [securities] as a result of [defendant's solicitation").

Because the AC's allegations fall short of the standard set by *Pinter,* the Court dismisses Count One for failure to state a claim.

### 2. Control-Person Liability Under Section 15

It follows from this dismissal that dismissal of the AC's "control person" claims under Section 15 of the Securities Act against Coinbase Global and Brian Armstrong is also required. *See* 15 U.S.C. § 77o. Such claims require a plaintiff to allege "(a) a primary violation by a controlled person, and (b) control by the defendant of the primary violator." *In re Glob. Crossing, Ltd. Sec. Litig.,* No. 02 Civ. 910 (GEL), 2005 WL 2990646, at *7 (S.D.N.Y. Nov. 7, 2005). The primary violation that is the basis for the Section 15 claims is the Section 12(a) claim against Coinbase in Count One, which the Court has dismissed. The Court accordingly dismisses the derivative Count Two for failure to state a claim.

### B. Claims Under the Exchange Act

The AC brings several sets of related claims under the Exchange Act. First, it brings claims to rescind illegal contracts to pay transaction fees to an unregistered exchange against Coinbase Global, Inc. and Coinbase, Inc., under Sections 5, 15(a)(1) and 29(b) of the Act, *see* AC ¶¶ 956–65 (Count Three); *id.* ¶¶ 966–78 (Count Four); *see also* 15 U.S.C. §§ 78e, 78o(a)(1), 78cc(b). Second, it brings claims to rescind illegal contracts to purchase securities from an

19

unregistered exchange against Coinbase Global, Inc. and Coinbase, Inc., under Sections 5, 15(a)(1) and 29(b) of the Exchange Act, *see* AC ¶¶ 979–88 (Count Five); *id.* ¶¶ 989–1001 (Count Six); *see also* 15 U.S.C. §§ 78e, 78o(a)(1), 78cc(b).  Third, it brings a claim under Section 20 for control-person liability against Coinbase Global, Inc. and Armstrong; this claim is based upon the violations alleged in Counts Three through Six, *see* AC ¶¶ 1002–15 (Count Seven); *see also* 15 U.S.C. § 78t(a).  The Court addresses first the claims of direct violations of the Act (Counts Three through Six) and then addresses the control-person claim (Count Seven).

### 1.    Allegations Relating to the Illegal Contracts

The AC's substantive claims under the Exchange Act seek rescission of the transactions involving the Tokens under Section 29(b).  Section 29(b) provides in part:

> Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract . . . the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule, or regulation thereunder, shall be void . . . as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract.

15 U.S.C. § 78cc(b).  To establish a violation of Section 29(b), a plaintiff must show that "(1) the contract involved a prohibited transaction, (2) he is in contractual privity with the defendant[s], and (3) he is in the class of persons the [Exchange] Act was designed to protect."  *EMA Fin., LLC v. Vystar Corp., Inc.*, No. 19 Civ. 1545 (ALC) (GWG), 2021 WL 1177801, at *2 (S.D.N.Y. Mar. 29, 2021).

The AC keys its allegations on the first element—a contract involving a prohibited transaction—to the theory that the Tokens were "prohibited," in violation of two other sections of the Exchange Act.  As plaintiffs articulate this theory in their memorandum of law:

> The purchases and sales at issue in this action constitute individual contracts that are voidable because they are entirely premised on the illegal purchase or sale of an unregistered security by an unregistered broker/dealer on an unregistered

exchange, in violation of Sections 5 and 15 of the Exchange Act.  Because the contracts at issue are facially unlawful (since each is entirely predicated on violations of federal and state law), they are voidable at [p]laintiffs' election under Section 29(b).

Pl. Opp. at 1–2.

The parties dispute whether Section 29(b) provides a private cause of action to sue for a violation of Sections 5 and 15(a) (or any provision) of the Exchange Act.  Defendants argue not. *Compare* Defs. Mem. at 13–17, *with* Pl. Opp. at 17–23.

Regardless, these claims fail, because the AC's allegations as to the first element—that "the contract involved a prohibited transaction," *EMA Fin., LLC*, 2021 WL 1177801, at *2—are deficient.  Under Section 29(b), "only unlawful contracts may be rescinded, not unlawful transactions made pursuant to lawful contracts." *Zerman v. Jacobs*, 510 F. Supp. 132, 135 (S.D.N.Y.), *aff'd*, 672 F.2d 901 (2d Cir. 1981).  "This test manifests the common-law principle that a contract to perform an illegal act is void, *Ema Fin., LLC v. Vystar Corp.*, 336 F.R.D. 75, 81 (S.D.N.Y. 2020), whereas rescission is not available when "the violation complained of is collateral or tangential to the contract between the parties," *Slomiak v. Bear Stearns & Co.*, 597 F. Supp. 676, 682 (S.D.N.Y. 1984).  A contract can be voided only where "there could be no performance under the contract without violating the [Exchange] Act," *id.* (citing *Eastside Church of Christ v. Nat'l Plan, Inc.*, 391 F.2d 357 (5th Cir. 1968)).

The parties disagree as to the "contract" implicated by plaintiffs' claims.  Defendants contend that the "contract" that must have "'on its face,' require[d] the performance of an illegal act," *Tanzanian Royalty Expl. Corp. v. Crede CG III, Ltd.*, No. 18 Civ. 4201 (LGS), 2019 WL 1368570, at *13 (S.D.N.Y. Mar. 26, 2019), could only be the user agreement.  Plaintiffs, however, take a transaction-specific view.  They argue that "[e]ach of [p]laintiffs' transactions on Coinbase is a separate contract between the user and Coinbase to effect a trade at a given

21

price.  Those purchase and sale contracts are distinct from the User Agreement [d]efendants argue applies to [p]laintiffs."  Pl. Opp. at 20.

Plaintiffs' notion that each transaction involving any one of the Tokens is the "contract" implicated by their Section 29(b) claims lacks factual support—the AC does not, for example, identify any transaction-specific contract.  And plaintiffs' notion that, without more, each individual purchase or sale qualifies as a contract within the meaning of Section 29(a) is without support in the case law.  This Court, in fact, confronted substantially the same issue in the context of a similar factual pattern, in which securities investors made purchases or sales against the backdrop of a foundational agreement between them and their investment firm that predated (and governed) the individual transactions.  *See In re Bernard L. Madoff Inv. Sec., LLC*, 605 B.R. 570, 589, 591 n.11 (S.D.N.Y. 2019), *aff'd*, 830 F. App'x 669 (2d Cir. 2020) (citing *Zerman*, 510 F. Supp. at 135) (rejecting recission of transactions where there was "no suggestion that the basic customer agreement plaintiff signed is not lawful"); *Palmer v. Thomson & McKinnon Auchincloss, Inc.*, 474 F. Supp. 286, 291 (D. Conn. 1979) (rejecting that "Section 29(b) should not only apply to the basic contract between the parties but also to each transaction that occurs thereunder").

The Court follows suit here.  As pled, the only contract capable of rescission here under Section 29(b) is the User Agreement.  Plaintiffs' initial Complaint is again telling on this point, on its own terms and insofar as it incorporates by reference the User Agreement, as reviewed above.  The Complaint expressly alleges that "Coinbase entered into contracts via the Coinbase User Agreement, with Plaintiffs and the members of the Class and Subclasses, *pursuant to which* Plaintiffs purchased Digital Asset Securities through Coinbase and paid Coinbase fees for the use of its securities exchanges."  Compl. ¶ 273 (emphasis added).  This allegation destroys the AC's

Exchange Act claims, insofar as it tracks, virtually verbatim, the statutory standard. It is again no escape for plaintiffs to have filed an Amended Complaint that excises all references to the User Agreement, for the reasons above. By stripping away all references to the User Agreement, the AC is able to add Exchange Act claims permitting rescission. But once plaintiffs' earlier allegations in the Complaint as to the same transactions regarding the Tokens are treated as cognizable, the AC's bid to pursue claims for rescission based on a course of dealings not involving the User Agreement becomes unsustainable.

Critical to the analysis under Section 29(b), performance of the User Agreement did not necessitate illegal acts. Indeed, as defendants note, plaintiffs admit continuing to use the Coinbase platforms since filing the original lawsuit, and "that the Coinbase 'platform has other uses beyond the trading of securities, including the trading of crypto-commodities (such as Bitcoin or Ethereum), which are not the subject of this suit.'" Defs. Mem. at 18 (quoting Dkt. 31 at 6 n.3). Indeed, as defendants note, because users are free to transact in other assets—including Bitcoin or Ethereum, or not at all—the User Agreement cannot be said to require any party to transact in the Tokens that the AC depicts as unregistered securities. *Id.*; *see* AC ¶ 49. Thus, viewed facially, "the customer agreement at issue here is a lawful one." *In re Bernard L. Madoff Inv. Sec., LLC*, 605 B.R. at 591.

The Court accordingly dismisses the AC's Counts Three through Six under the Exchange Act. These claims do not identify a contract between plaintiffs and Coinbase that would support rescission. And the agreement that plaintiffs' predecessor pleading identified as covering such transactions, the User Agreement, definitely would not.

### 2.    Control-Person Liability Under Section 20

As with its Securities Act claims, the AC brings "control person" claims against Coinbase Global and Armstrong, this time under Section 20 of the Exchange Act. To state a claim under

Section 20(a), "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (internal quotation marks omitted) (quoting *ATSI Commc'ns, Inc.*, 493 F.3d at 98); *see Kalnit v. Eichler*, 85 F. Supp. 2d 232, 246 (S.D.N.Y. 1999); *see also In re Lihua Int'l, Inc. Sec. Litig.*, No. 14 Civ. 5037 (RA), 2016 WL 1312104, at *18 (S.D.N.Y. Mar. 31, 2016).  The control-person claims here are premised on the AC's substantive Exchange Act claims, which the Court has dismissed.  It follows that the control-person claims must also be dismissed for want of a well-pled primary violation.

**C.     State Claims**

The Court must next determine whether to exercise supplemental jurisdiction over the AC's state-law claims, brought under California, Florida, and New Jersey laws, *see* AC ¶¶ 1016–49 (California), 1050–71 (Florida), 1072–1106 (New Jersey).

Federal district courts have supplemental jurisdiction over state-law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). However, such jurisdiction is discretionary, *see City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997), and a court "may decline to exercise supplemental jurisdiction" if it "has dismissed all claims over which it has original jurisdiction," 28 U.S.C. § 1367(c)(3).

A district court should, in deciding whether to exercise its supplemental jurisdiction, balance the traditional "values of judicial economy, convenience, fairness, and comity." *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); *see also Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994) ("[T]he discretion implicit in the word 'may' in subdivision (c) of

§ 1367 permits the district court to weigh and balance several factors, including considerations of judicial economy, convenience, and fairness to litigants."). However, both the Second Circuit and the Supreme Court have held that, as a general rule, "when the federal claims are dismissed the 'state claims should be dismissed as well.'" *In re Merrill Lynch Ltd. P'ships Litig.,* 154 F.3d 56, 61 (2d Cir. 1998) (quoting *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726 (1966)); *see also United Mine Workers of Am.*, 383 U.S. at 726 ("Certainly, if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well."); *McGugan v. Aldana-Bernier*, No. 11 Civ. 342 (TLM), 2012 WL 1514777, at *8 (E.D.N.Y. Apr. 30, 2012) ("[W]hen all federal claims are eliminated in the early stages of litigation, the balance of factors generally favors declining to exercise pendent jurisdiction over remaining state law claims and dismissing them without prejudice."), *aff'd*, 752 F.3d 224 (2d Cir. 2014).

Here, no circumstances counsel in favor of the Court's exercising supplemental jurisdiction over plaintiffs' state-law claims. The Court has not invested the resources necessary to resolve these non-federal claims, and factors of convenience, fairness, and comity do not require the Court to exercise supplemental jurisdiction. The Court accordingly declines to exercise supplemental jurisdiction over these claims. These claims are dismissed without prejudice.

**D.     Dismissals With and Without Prejudice**

For the foregoing reasons, the Court dismisses the AC.

As to plaintiffs' federal-law claims, the Court's assessment is that granting leave to amend would be futile. Plaintiffs have already had an opportunity to amend their complaint, *see* Dkts. 1, 43, and as reviewed above, they did so by adding numerous allegations that directly contradicted their initial Complaint. And plaintiffs have made only a perfunctory request for leave to amend anew in the event of the AC's dismissal. In their opposition to the motion to

dismiss, they ask that "permission to replead be granted" should the Court dismiss the claims. Pl. Opp. at 30. But plaintiffs have not identified any concrete amendments or additions, let alone ones that might cure the deficiencies afflicting their Securities Act and Exchange Act claims. This supports denial of leave to amend. *See Gregory v. ProNAi Therapeutics Inc.*, 757 F. App'x 35, 39 (2d Cir. 2018) (affirming denial of leave to amend where "plaintiffs sought leave to amend in a footnote at the end of their opposition to defendants' motion to dismiss" and "included no proposed amendments"); *F5 Capital*, 856 F.3d at 89 (affirming denial of leave to amend on futility grounds where plaintiff provided "no clue as to how the complaint's defects would be cured through an amendment" (internal quotation marks omitted)). And given the analysis above, it is difficult to see how any revised such claims could overcome plaintiffs' factual averments in the Complaint and the terms of the User Agreement. "In the absence of any identification of how a further amendment would improve upon the Complaint, leave to amend must be denied as futile." *In re WorldCom, Inc. Sec. Litig.*, 303 F. Supp. 2d 385, 391 (S.D.N.Y. 2004); *see also, e.g., Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 347 F. App'x 617, 622 (2d Cir. 2009) (summary order) ("Granting leave to amend is futile if it appears that plaintiff cannot address the deficiencies identified by the court and allege facts sufficient to support the claim."); *Jordan v. Chase Manhattan Bank*, 91 F. Supp. 3d 491, 510 (S.D.N.Y. 2015).

The Court therefore dismisses plaintiffs' federal claims with prejudice. The dismissal is, however, without prejudice as to plaintiffs' state-law claims, which have been dismissed based on a decision not to exercise supplemental jurisdiction.

## CONCLUSION

For the reasons above, the Court dismisses all claims in the AC. The federal claims are dismissed with prejudice. The state-law claims are dismissed without prejudice.

SPA-27

The Clerk of Court is respectfully directed to terminate the motion pending at docket number 58, and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: February 1, 2023
       New York, New York

**SPA-28**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
CHRISTOPHER UNDERWOOD et al.,
Individually and on Behalf of All Others
Similarly Situated,

                        Plaintiffs,

        -against-                           21 **CIVIL** 8353 (PAE)

                                                  <u>**JUDGMENT**</u>

COINBASE GLOBAL, INC., COINBASE, INC.,
and BRIAN ARMSTRONG,

                        Defendants.
-----------------------------------------------------------X

        It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Opinion & Order dated February 1, 2023, the Court has dismissed all claims

in the AC. The federal claims are dismissed with prejudice. The state-law claims are dismissed

without prejudice; accordingly, the case is closed.

**Dated:** New York, New York

       February 1, 2023

                                     **RUBY J. KRAJICK**

                                    _____
                                       **Clerk of Court**

                **BY:**         K. Mango

                                     _____
                                       **Deputy Clerk**