# 23-184

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

LOUIS OBERLANDER, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY
SITUATED, CHRISTOPHER UNDERWOOD, ON BEHALF OF HIMSELF AND ALL
OTHERS SIMILARLY SITUATED, HENRY RODRIGUEZ,

*Plaintiffs-Appellants,*

ZENEYDA PATIN, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY
SITUATED,

*Plaintiff,*

–v.–

COINBASE GLOBAL INC., COINBASE, INC., BRIAN ARMSTRONG,

*Defendants-Appellees.*

On Appeal From the United States District Court
Southern District Of New York, Hon. Paul A. Engelmayer

## BRIEF OF AMICUS CURIAE THE CHAMBER OF
## COMMERCE OF THE UNITED STATES OF AMERICA
## IN SUPPORT OF DEFENDANTS-APPELLEES

TYLER S. BADGLEY
KEVIN R. PALMER
U.S. CHAMBER LITIGATION CENTER
1615 H Street N.W.
Washington, D.C. 20062
(202) 463-5747

JUDSON O. LITTLETON
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, D.C. 20006-5215
(202) 956-7500
littletonj@sullcrom.com

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* the Chamber of Commerce of the United States of America states that it is a non-profit, tax-exempt organization incorporated in the District of Columbia. It has no parent corporation, and no publicly held company owns ten percent or more of its stock.

# TABLE OF CONTENTS

*Page*

Interest of the *amicus curiae* ............................................................1

Introduction ...................................................................................2

Argument .......................................................................................5

    District courts may rely on superseded pleadings to dismiss
plainly meritless claims in cases of obvious gamesmanship....................5

    A.    Allowing meritless claims to proceed to discovery imposes
substantial costs in return for no benefit .......................................5

    B.    Nothing bars district courts, in appropriate cases, from
relying on the allegations in a superseded complaint to
dismiss a plainly meritless claim ....................................................15

Conclusion ....................................................................................23

# TABLE OF AUTHORITIES

*Page(s)*

CASES

*Behlen* v. *Merrill Lynch,*
311 F.3d 1087 (11th Cir. 2002) .................................................................19

*Bell Atl. Corp.* v. *Twombly,*
550 U.S. 544 (2007) ..........................................................................3, 4, 5, 15

*Blue Chip Stamps* v. *Manor Drug Stores,*
421 U.S. 723 (1975) ..........................................................................7, 8

*Brown* v. *Calamos,*
664 F.3d 123 (7th Cir. 2011) .................................................................18

*Carnegie-Mellon University* v. *Cohill,*
484 U.S. 343 (1988) ..........................................................................18

*Celotex Corp.* v. *Catrett,*
477 U.S. 317 (1987) ..........................................................................20

*Convertino* v. *U.S. Department of Justice,*
684 F.3d 93 (D.C. Cir. 2012) .................................................................21

*Cortec Industries, Inc.* v. *Sum Holding L.P.,*
949 F.2d 42 (2d Cir. 1991) .................................................................4, 16, 17

*Kramer* v. *Time Warner Inc.,*
937 F.2d 767 (2d Cir. 1991) .................................................................17

*Palm Beach Strategic Income, LP* v. *Salzman,*
2011 WL 1655575 (E.D.N.Y. May 2, 2011) ..................................................4

*Pruell* v. *Caritas Christi,*
678 F.3d 10 (1st Cir. 2012) .................................................................3

*Rockwell International Corp.* v. *United States,*
549 U.S. 457 (2007) ..........................................................................18

*Scarola Malone & Zubatov LLP* v. *Verizon
Communications, Inc.,*
2015 WL 3884211 (S.D.N.Y. June 24, 2015) ..............................................19

*In re Time Warner Inc. Securities Litigation,*
9 F.3d 259 (2d Cir. 1993) .................................................................16, 20

## STATUTES & RULES

15 U.S.C.:

 § 77p ........................................................................................10

 § 77z–1(b) ...................................................................................9

 § 78bb(f) ....................................................................................10

 § 78u-4(b) ...................................................................................9

Fed. R. Civ. P. 1 ............................................................................16

Fed. R. Civ. P. 12(d) ..................................................................... 20

Fed. R. Civ. P. 15(a)(1)(B) ...........................................................21

Fed. R. Civ. P. 56(d) .....................................................................20

## OTHER AUTHORITIES

141 Cong. Rec. S17979 (daily ed. Dec. 5, 1995) (Statement of
 Sen. Duncan Faircloth) ...........................................................14

H.R. Rep. No. 104-50 (1995) .........................................................13

H.R. Rep. No. 104-369 (1995) (Conf. Rep.) ...................................9

H.R. Rep. No. 105-640 (1998) ........................................................10

S. Rep. No. 104-98 (1995) ..................................................9, 10, 13

A.C. Pritchard, *Markets as Monitors: A Proposal to Replace
Class Actions with Exchanges as Securities Fraud
Enforcers,*
 85 Va. L. Rev. 925 (1999) .......................................................8

Adena Friedman, *The Promise of Market Reform: Reigniting
America's Economic Engine,*
 Harvard Law School Forum on Corporate Governance
 (May 18, 2017) .......................................................................13

Andrew M. Pardieck, *The Shifting Sands of Cost Shifting,*
 69 Clev. St. L. Rev. 349 (2021) ...............................................6

6 Charles Alan Wright & Arthur R. Miller,
 *Federal Practice and Procedure* § 1474 (3d ed. 2008) .............4

Elisabeth Kempf & Oliver Spalt, *Attracting the Sharks: Corporate Innovation and Securities Class Action Lawsuits*, European Corporate Governance Institute – Finance Working Paper No. 614/2019 (Jan. 2022)....................................14

Laura Geary, *The Exception to Rule 12(d): Incorporation by Reference of Matters Outside the Pleadings*, 89 U. Chi. L. Rev. 979 (2022) ...............................................16, 20

Jessica Erickson, *Heightened Procedure*, 102 Iowa L. Rev. 61 (2016).......................................................8, 22

Jessica Erickson, *Investing in Corporate Procedure*, 99 B.U. L. Rev. 1367 (2019) ............................................12

*See* John C. Coffee, Jr., *The Changing Character of Securities Litigation in 2019: Why It's Time to Draw Some Distinctions*, CLS Blue Sky Blog (Jan. 22, 2019)........................................11

John H. Beisner, Jordan M. Schwartz & Paden Gallagher, *Unfair, Inefficient, Unpredictable: Class Action Flaws and the Road to Reform*, U.S. Chamber Institute for Legal Reform (Aug. 2022) ..........11

Jonathan Brogaard et al., *Does Shareholder Litigation Risk Cause Public Firms to Delist? Evidence from Securities Class Action Lawsuits*, Journal of Financial and Quantitative Analysis (forthcoming 2023)....................................................14

Jonathan Remy Nash & Joanna Shepherd, *Aligning Incentives and Cost Allocation in Discovery*, 71 Vand. L. Rev. 2015 (2018) ........................................8

Lawyers for Civil Justice, Civil Justice Reform Grp. & U.S. Chamber Institute for Legal Reform, *Litigation Cost Survey of Major Companies* (2010)................................6

Malcolm E. Wheeler & Theresa Wardon Benz, *Litigation Financing: Balancing Access with Fairness*, 13 J. Tort L. 281 (2020) ............................................3, 6

Marilyn G. Mancusi, *Attorneys, E-Discovery, and the Case for 37(g)*,
97 Notre Dame L. Rev. 2227 (2022)...............................................6

Michelle Reed & Matthew Lloyd, *Stemming the Tide of Meritless Securities Class Actions*,
Thomson Reuters
(Mar. 8, 2019)....................................................................11

Nicholas M. Pace & Laura Zakaras, *Where The Money Goes: Understanding Litigant Expenditures For Producing Electronic Discovery*,
RAND Institute for Civil Justice (2012) ....................................6

Order of Apr. 22, 1993, Amendments to the Fed. R. Civ. P.,
*reprinted in* 146 F.R.D. 401 (1993)........................................16

Paul Stancil, *Balancing the Pleading Equation*,
61 Baylor L. Rev. 90 (2009)..........................................9, 21, 22

Peter S. Menell & Ryan Vacca, *Revisiting and Confronting the Federal Judiciary Capacity "Crisis": Charting A Path for Federal Judiciary Reform*,
108 Cal. L. Rev. 789 (2020).....................................................7

Richard M. Phillips & Gilbert C. Miller, *Private Securities Litigation Reform Act of 1995: Rebalancing Litigation Risks and Rewards for Class Action Plaintiffs, Defendants and Lawyers*,
51 Bus. Law. 1009 (1996).................................................7, 13

Stephen J. Choi, Karen K. Nelson & A.C. Pritchard, *The Screening Effect of the Private Securities Litigation Reform Act*,
6 J. Empirical Legal Stud. 35 (2009) .......................................12

Vlad Vainberg, *When Should Discovery Come With a Bill? Assessing Cost Shifting for Electronic Discovery*,
158 U. Pa. L. Rev. 1523 (2010)..............................................6

## INTEREST OF THE *AMICUS CURIAE*

The Chamber of Commerce of the United States of America (Chamber) is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases that, like this one, raise issues of concern to the nation's business community.

Many of the Chamber's members have substantial experience in defending against meritless lawsuits filed with the hope of simply surviving a motion to dismiss and forcing a settlement—a problem that is particularly pronounced in securities class actions. They thus have a strong interest in ensuring district courts have the authority to deter plaintiffs' gamesmanship in amending complaints to conceal fatal legal deficiencies.[1]

---

[1] The Chamber affirms that no party or counsel for any party authored this brief in whole or in part and that no one other than the Chamber, its members, or its counsel contributed any money that was intended to fund the preparation or submission of this brief. The parties have consented to this filing.

## INTRODUCTION

The district court properly dismissed this action after concluding that, based on a user agreement Plaintiffs signed with Coinbase and basic allegations about the nature of Plaintiffs' transactions on Coinbase's platform, Plaintiffs could not plead the gatekeeping "statutory seller" element for Section 12 liability or a viable claim for rescission under Section 29(b) of the Securities Exchange Act. The court declined to credit directly contrary allegations Plaintiffs added to their amended complaint after it determined that Plaintiffs had "strategically" amended their original complaint "to elude the facts and . . . User Agreement" that made clear their claims were a non-starter, all in a transparent "attempt to evade dismissal." SPA-12, 16.

On appeal, Plaintiffs challenge those conclusions. But they also go further and argue that, regardless of whether the district court was correct—even if Plaintiffs engaged in obvious gamesmanship in an effort to sneak a meritless case past a motion to dismiss—the court still had no authority to dismiss the case. Instead, Plaintiffs and their *amici* contend, once Plaintiffs filed an amended complaint, the Federal Rules *required* the district court to blind itself to Plaintiffs' machinations and the facts that doomed their claims—at least until after discovery.

That is a rule that only a plaintiffs' lawyer could love. There is no reason to waste party and judicial resources on "the enormous cost of modern discovery," *Pruell* v. *Caritas Christi*, 678 F.3d 10, 13 (1st Cir. 2012), if the district court knows the plaintiff's claim is "unavoidably" hopeless, SPA-16. Doing so is not just pointless; it is actively harmful. As every plaintiffs' lawyer knows, the mere "threat of discovery expense will push cost-conscious defendants to settle *even anemic cases*." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 559 (2007) (emphasis added). Such settlements of baseless lawsuits "impose an injustice on the defendant [and] a windfall transfer to the plaintiff [and] the plaintiff's lawyer," and are "a misuse of societal resources, including the resources of the justice system." Malcolm E. Wheeler & Theresa Wardon Benz, *Litigation Financing: Balancing Access with Fairness*, 13 J. Tort L. 281, 290 (2020). They also fuel the incentives that drive vexatious litigation in the first place. As decades of experience in securities class action cases like this one make clear, such litigation imposes enormous costs on businesses, courts, and the national economy. Congress has repeatedly legislated toward the goal of allowing fewer meritless suits to go to discovery, not more. We urge the Court to reject Plaintiffs' rule that would require a judge to

knowingly waste judicial resources, just to allow plaintiffs to more easily extract wrongful settlements from defendants.

Contrary to the bright-line rule pressed by Plaintiffs and their *amici*, nothing in the Federal Rules requires courts to ignore these practicalities and fair play concerns simply because the facts that doom plaintiffs' claims appear in a superseded complaint. As many courts in this Circuit have correctly held, although courts "should typically disregard prior contradictory pleadings" at the Rule 12(b)(6) stage, "there may be a rare occasion to depart from this usual rule," *Palm Beach Strategic Income, LP* v. *Salzman*, 2011 WL 1655575, at *5 (E.D.N.Y. May 2, 2011), as the district court did here. Nothing in "the bare bones of Rule 12(b)(6)," *Cortec Indus., Inc.* v. *Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991), forbids that sensible approach. Rather, the very point of the Rule is to allow the court to adjudicate a case's "basic deficiency . . . at the point of minimum expenditure of time and money by the parties and the court." *Twombly*, 550 U.S. at 558. The "liberal policy toward allowing amendments" under Rule 15 is likewise intended to facilitate "the determination of cases on their merits," 6 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1474 (3d ed. 2008)—an objective that is *disserved* by forcing

courts to ignore case-dispositive facts or materials that plaintiffs strategically omit from an amended complaint.

Because it lacks any basis in the Federal Rules or common sense, the Court should reject Plaintiffs' proposed absolute rule forbidding courts from ever relying on facts or materials alleged in a superseded complaint.

## ARGUMENT

## DISTRICT COURTS MAY RELY ON SUPERSEDED PLEADINGS TO DISMISS PLAINLY MERITLESS CLAIMS IN CASES OF OBVIOUS GAMESMANSHIP

### A. Allowing Meritless Claims To Proceed To Discovery Imposes Substantial Costs In Return For No Benefit

1. For today's businesses that find themselves the targets of litigation, the economic consequences of a lawsuit, meritorious or otherwise, proceeding beyond the motion-to-dismiss stage can be oppressive. As the Supreme Court put it in *Twombly*, "it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery . . . but quite another to forget that proceeding to antitrust discovery can be expensive." 550 U.S. at 558. That concern extends well beyond the antitrust context. Around the time *Twombly* was decided, taking into account all forms of civil litigation, a surveyed sample of Fortune 200 companies paid an average *per-case* discovery cost "of $621,880

to $2,993,567," with "companies at the high end" of the study reporting "average per-case discovery costs ranging from $2,354,868 to $9,759,900."[2]

Those staggering costs are not abating. There is of course "nothing indicating that, more than a decade later, there are fewer documents being created," "fewer documents being demanded by plaintiffs, or lower costs for defendants to produce the documents." Wheeler & Benz, 13 J. Tort L. at 290. To the contrary: the dramatic increase in stored electronic data has caused the costs of discovery to skyrocket. U.S. litigants spent an estimated $10.11 billion on electronic discovery in 2018,[3] compared to $2.79 billion in 2007.[4] At an individual-case level, in 2018, Fortune 200 companies spent an average of at least $1 million per case *on e-discovery alone*.[5] That figure does not take into

---

[2] Lawyers for Civil Justice, Civil Justice Reform Grp. & U.S. Chamber Institute for Legal Reform, *Litigation Cost Survey of Major Companies* 3 (2010) (emphasis added), https://www.uscourts.gov/sites/default/files/litigation_cost_survey_of_major_companies_0.pdf.

[3] Andrew M. Pardieck, *The Shifting Sands of Cost Shifting*, 69 Clev. St. L. Rev. 349, 436 (2021).

[4] Vlad Vainberg, *When Should Discovery Come With a Bill? Assessing Cost Shifting for Electronic Discovery*, 158 U. Pa. L. Rev. 1523, 1533-34 (2010).

[5] *See* Marilyn G. Mancusi, *Attorneys, E-Discovery, and the Case for 37(g)*, 97 Notre Dame L. Rev. 2227, 2234 & n. 57 (2022); *see also* Nicholas M. Pace & Laura Zakaras, *Where The Money Goes: Understanding Litigant Expenditures For Producing Electronic Discovery*, RAND Institute for Civil Justice 20 (2012), http://www.rand.org/content/dam/rand/pubs/monographs/2012/RAND_MG1208.pdf.

account the other significant costs of discovery, such as those associated with other kinds of written discovery, depositions, and legal fees. And it also does not account for the burden on federal courts—which "face unprecedented caseloads," Peter S. Menell & Ryan Vacca, *Revisiting and Confronting the Federal Judiciary Capacity "Crisis": Charting A Path for Federal Judiciary Reform*, 108 Cal. L. Rev. 789, 880 (2020)—because, as every litigant knows, with increased discovery come increased discovery disputes that a judge will be called upon to resolve.

Moreover, as courts and commentators have long recognized, the burden of discovery on corporate defendants extends beyond these direct costs to broader drags on the business. Discovery "may frustrate or delay normal business activity," as it frequently involves "extensive deposition of the defendant's officers and associates" whose time would be better spent running the company. *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U.S. 723, 740-741 (1975). Litigation expenses also cause money to be "diverted from research and development and capital investments." Richard M. Phillips & Gilbert C. Miller, *The Private Securities Litigation Reform Act of 1995: Rebalancing Litigation Risks and Rewards for Class Action Plaintiffs, Defendants and Lawyers*, 51 Bus. Law. 1009, 1028 (1996). In the full accounting, these

opportunity costs may "dwarf the expense of attorneys' fees." A.C. Pritchard, *Markets as Monitors: A Proposal to Replace Class Actions with Exchanges as Securities Fraud Enforcers*, 85 Va. L. Rev. 925, 953 (1999).

All too often, these costs of discovery force business defendants to conclude that it would "be cheaper for [them] to settle" than continue to litigate, even when "both sides know or strongly suspect that the case lacks merit." Jessica Erickson, *Heightened Procedure*, 102 Iowa L. Rev. 61, 70 (2016). An in-house lawyer at General Electric once estimated that 90% "of the company's settlement decisions were driven by the costs of discovery, not the merits of the cases." Jonathan Remy Nash & Joanna Shepherd, *Aligning Incentives and Cost Allocation in Discovery*, 71 Vand. L. Rev. 2015, 2027 (2018) (citing Jon Kyl & E. Donald Elliott, Comment to the Advisory Committee on Civil Rules Proposed Amendments to Rule 26 Federal Rules of Civil Procedure 2 (2013)).[6] Thus, as plaintiffs' lawyers understand quite well, "even a complaint which by objective standards may have very little chance of success at trial has a settlement value to the plaintiff out of any proportion to [that] prospect of success." *Blue Chip Stamps*, 421 U.S. at 740. In other words, due to the substantial "cost disparity" of a case that proceeds to

---

[6] https://perma.cc/WJP6-Y8R3.

discovery against a corporate defendant, plaintiffs have substantial incentives to file even claims with no "expected trial value" in the hopes of merely surviving a motion to dismiss, knowing that the "defendant may settle the claim" to avoid the costs of discovery.  Paul Stancil, *Balancing the Pleading Equation*, 61 Baylor L. Rev. 90, 133 (2009).

2.  Congress has long recognized that these troublesome dynamics are particularly acute in securities class actions such as this one, and responded by enacting an entirely separate body of law designed to ensure early dismissal of meritless securities cases.  Most pertinently, upon finding that the "cost of discovery often forces innocent parties to settle frivolous securities class actions," Congress enacted the Private Securities Litigation Reform Act of 1995 (PSLRA).  H.R. Rep. No. 104-369, at 37 (1995) (Conf. Rep.).  Congress intended PSLRA "to reduce significantly the economic incentive to file meritless lawsuits," S. Rep. No. 104-98, at 13 (1995), in a number of ways. Among other barriers to vexatious litigation, Congress adopted heightened pleading standards to survive a motion to dismiss, 15 U.S.C. § 78u-4(b), and required an automatic stay of discovery while such a motion is pending, *id.* §§ 77z–1(b), 78u-4(b)(3)(B).

After plaintiffs' lawyers tried to avoid the effects of these reforms by filing frivolous securities suits in state court rather than federal court, Congress responded by enacting the Securities Litigation Uniform Standards Act of 1998 (SLUSA).  That legislation preempted state-law causes of action in cases involving securities listed and traded on national securities exchanges, and facilitated the immediate removal of such cases to federal court.  *See* 15 U.S.C. §§ 77p, 78bb(f).  Again, Congress believed such special procedural protections were needed because defendants are often "economically forced to settle, regardless of the lack of merits of the suit, simply to avoid the . . . expense of litigating."  H.R. Rep. No. 105-640, at 9 (1998).

In addition to the significant cost asymmetry, Congress recognized that—even outside of the type of securities claim at issue in this case—meritless securities class actions present a distinct problem to the country's business community because "a complaint alleging violations of the Federal securities laws is easy to craft and can be filed with little or no due diligence."  S. Rep. No. 104-98, at 8.  A simple "drop in a public company's stock price . . . can trigger numerous" suits.  *Id.*  That is particularly true of so-called "event-driven" cases, in which plaintiffs argue that a stock drop following a significant negative event—an airplane crash, a corporate scandal, the revelation of

negative side effects, etc.—is actually attributable to the company's failure to disclose its vulnerability to such event. *See* John C. Coffee, Jr., *The Changing Character of Securities Litigation in 2019: Why It's Time to Draw Some Distinctions*, CLS Blue Sky Blog (Jan. 22, 2019).[7] These cases are particularly "easy for plaintiffs to bring even though they are less likely to have merit" because plaintiffs can "rely on the investigative work of" the government or tort plaintiffs "pertaining to the same event." Michelle Reed & Matthew Lloyd, *Stemming the Tide of Meritless Securities Class Actions*, Thomson Reuters, 3 (Mar. 8, 2019).[8]

Congress's efforts have not stemmed the tide of meritless securities litigation filed to extort nuisance settlements. Instead, "[t]hanks to the creativity of the plaintiffs' bar," "questionable and potentially abusive securities class actions have exploded to levels above where they were before the enactment of the PSLRA." John H. Beisner, Jordan M. Schwartz & Paden Gallagher, *Unfair, Inefficient, Unpredictable: Class Action Flaws and the*

---

[7] https://clsbluesky.law.columbia.edu/2019/01/22/the-changing-character-of-securities-litigation-in-2019-why-its-time-to-draw-some-distinctions.

[8] https://perma.cc/M28Z-J3WC.

*Road to Reform*, U.S. Chamber Institute for Legal Reform 28 (Aug. 2022).[9] According to a 2019 article, "[m]ore than a quarter of the settlements in securities class actions are for less than two million dollars—one commonly used cutoff for nuisance settlements in this area." Jessica Erickson, *Investing in Corporate Procedure*, 99 B.U. L. Rev. 1367, 1378 (2019). To be sure, studies have found that the PSLRA's "procedural barriers have resulted in a higher percentage of securities fraud class actions being dismissed," confirming Congress's assessment that many are entirely meritless. Stephen J. Choi, Karen K. Nelson & A.C. Pritchard, *The Screening Effect of the Private Securities Litigation Reform Act*, 6 J. Empirical Legal Stud. 35, 36 (2009). But at the same time, it appears that the PSLRA did "little to discourage the *filing* of frivolous suits." *Id.* (emphasis added); *see id.* at 37 ("We do not find statistically significant evidence that nuisance suits have been discouraged."). And allowing any of these plainly meritless cases to proceed beyond the

---

[9] In the interest of full disclosure, the Chamber notes that the authors of this paper for its Institute of Legal Reform practice at the law firm that represents Defendants-Appellees in this case. To the Chamber's knowledge, none of the authors have participated as counsel in this matter, and the Chamber published the paper long before the district court's order, the filing of this appeal, or the Chamber's decision to participate as *amicus curiae* in this appeal.

motion-to-dismiss stage runs headlong into Congress's purposes in enacting the PSLRA and SLUSA.

3.  Congress's justified concern about baseless securities suits stems from the especially problematic costs involved.  Beyond the substantial costs associated with litigation itself, "businesses suffer as auditors and directors decline engagements and board positions" to avoid exposure.  H.R. Rep. No. 104-50, at 20 (1995).  Companies experience undeserved "reputational harm among customers, suppliers, and distributors," and face higher financing costs when "large contingent liabilities appear[] on their financial statements." Phillips & Miller, 51 Bus. Law. at 1028.  Director-and-officer insurers increase premiums or cease underwriting altogether.  S. Rep. No. 104-98, at 21. Shareholders suffer pointless losses, as the "mere filing of a securities class action has been estimated to wipe out an average of 3.5% of the equity value of a company."  Adena Friedman, *The Promise of Market Reform: Reigniting America's Economic Engine*, Harvard Law School Forum on Corporate Governance (May 18, 2017).[10]  "Money that would otherwise be spent on new job growth, or on research or development" is instead paid to lawyers.

---

[10]  https://corpgov.law.harvard.edu/2017/05/18/the-promise-of-market-reform-reigniting-americas-economic-engine.

141 Cong. Rec. S17979 (daily ed. Dec. 5, 1995) (Statement of Sen. Duncan Faircloth). And in the end, these "costs are passed along to consumers in the form of higher prices." *Id.* In short, vexatious securities litigation directly converts shareholder value, productive capital, and consumer dollars into plaintiffs' lawyer payouts.

These distortions ripple out into the national economy. Recent scholarship has suggested that "the overall economic costs of low-quality class actions are potentially even larger" than usually estimated because they "impose[] disproportionate costs" on innovative firms, creating an "implicit 'tax' on valuable innovation input." Elisabeth Kempf & Oliver Spalt, *Attracting the Sharks: Corporate Innovation and Securities Class Action Lawsuits*, European Corporate Governance Institute – Finance Working Paper No. 614/2019 (Jan. 2022). "[F]rivolous shareholder litigation" also "hurts the competitiveness of U.S. equity markets," as "even without direct financial loss the occurrence of low-quality lawsuits is sufficiently burdensome to disincentivize firms from listing in public stock markets." Jonathan Brogaard et al., *Does Shareholder Litigation Risk Cause Public Firms to Delist? Evidence from Securities Class Action Lawsuits*, Journal of Financial and Quantitative Analysis 33 (forthcoming 2023).

Again, Congress rightly sought to combat these effects when it enacted the PSLRA and SLUSA to facilitate early dismissal of baseless securities class actions. Any rule that would allow more of those cases to proceed into discovery is flatly contrary to those purposes. This Court should not bend Rule 12 to bar district judges from timely dismissing precisely the type of meritless litigation Congress has repeatedly targeted.

### B. Nothing Bars District Courts, In Appropriate Cases, From Relying On The Allegations In A Superseded Complaint To Dismiss A Plainly Meritless Claim

Notwithstanding these significant costs, Plaintiffs and their *amici* argue that district courts must blind themselves to the kind of gamesmanship that Plaintiffs engaged in here to avoid Defendants' motion to dismiss. As they tell it, if a party files a complaint that discloses on its face facts making clear that the claim fundamentally fails, but then amends the complaint to remove any reference to those facts (and even allege the polar opposite), the Federal Rules give the court no choice but to "send[] the parties into discovery." *Twombly*, 550 U.S. at 558. For many reasons, Plaintiffs are wrong.

1. As an initial matter, such mindless formalism expressly conflicts with the Rules themselves. As Rule 1 states, the rules "should be construed, administered, and employed by the court . . . to secure the just, speedy, and

inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. There is nothing "speedy" or "inexpensive" about allowing the parties to engage in costly discovery when the outcome is a *fait accompli*. Nor is there anything "just" about allowing plaintiffs to "extract[] undeserved settlements as the price of avoiding the extensive discovery costs that frequently ensue once a complaint survives dismissal." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 263 (2d Cir. 1993). As Justice Scalia once wrote, "it is undeniably important to the Rules' goal of 'the just, speedy, and inexpensive determination of every action' . . . that frivolous pleadings . . . be deterred." Order of Apr. 22, 1993, Amendments to the Fed. R. Civ. P., *reprinted in* 146 F.R.D. 401, 507 (1993) (Scalia, J., dissenting).

Consistent with that directive, this Court and others have developed several doctrines to put practical meat on the "bare bones of Rule 12(b)(6)." *Cortec Indus.*, 949 F.2d at 46-47. For example, district courts undisputedly have the power to consider materials not referenced in the complaint that are "integral to the complaint." Pl. Br. 36. Courts developed that exception to prevent plaintiffs from "strategically" forcing a court to ignore a "document that would allow the court to resolve the easy case." Laura Geary, *The Exception to Rule 12(d): Incorporation by Reference of Matters Outside the*

*Pleadings*, 89 U. Chi. L. Rev. 979, 995 (2022); *see Cortec Indus.*, 949 F.2d at 44 ("Plaintiffs' failure to include matters of which as pleaders they had notice and which were integral to their claim—and that they apparently most wanted to avoid—may not serve as a means of forestalling the district court's decision on the motion [to dismiss]."). Likewise, this Court has applied a particularly robust version of judicial notice in cases "alleging securities fraud," holding that district courts "may review and consider public disclosure documents required by law to be and which actually have been filed with the SEC." *Cortec Indus.*, 949 F.2d at 47; *see Kramer* v. *Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("Foreclosing resort to such documents might lead to complaints filed solely to extract nuisance settlements.").

These doctrines further the Federal Rules' interest in the "speedy" and "just" determination of plainly meritless cases by permitting the consideration of documents outside the four corners of a complaint when such documents make clear that Plaintiffs' claims cannot succeed. Plaintiffs offer no persuasive reason why courts must abandon that practical approach and pull wool over their own eyes simply because a similarly damning document or fact was referenced in a prior complaint but deleted or contradicted in an amended one.

2. Also contrary to Plaintiffs' suggestion, and consistent with that practical approach, the general rule that the filing of an amended complaint requires a court to ignore prior pleadings is not without exceptions. Courts have long been willing to consider a prior complaint when necessary to prevent manifest gamesmanship.

For example, to prevent "forum-manipulation concerns," the Supreme Court has held that "when a defendant removes a case to a federal court based on the presence of a federal claim, an amendment eliminating the original basis for federal jurisdiction generally does not defeat jurisdiction." *Rockwell Int'l Corp.* v. *United States*, 549 U.S. 457, 474 n. 6 (2007); *see Carnegie-Mellon Univ.* v. *Cohill*, 484 U.S. 343, 357 (1988) (noting that district courts "can consider whether the plaintiff has engaged in any manipulative tactics" by attempting to obtain remand to state court "simply by deleting all federal-law claims from the complaint"). Courts apply this principle in the context of removal under SLUSA, looking through artful pleading to assert federal jurisdiction and dismiss frivolous claims on the merits. *See Brown* v. *Calamos*, 664 F.3d 123, 131 (7th Cir. 2011) ("Nor can the suit be saved" from dismissal on the merits under SLUSA "by amending the complaint to delete the passage

that injected fraud into the case."); *Behlen* v. *Merrill Lynch*, 311 F.3d 1087, 1095 (11th Cir. 2002) (same).

Allowing district courts to consider facts alleged in prior complaints despite amended pleadings in extraordinary cases will not upend the usual pleading rules. As even Plaintiffs admit (Br. 25), courts in this Circuit "have disregarded amended allegations . . . only on . . . rare occasions." *Scarola Malone & Zubatov LLP* v. *Verizon Commc'ns, Inc.*, 2015 WL 3884211, at *5 (S.D.N.Y. June 24, 2015) ("[M]ost courts that have disregarded allegations in an amended complaint in order to consider contradictory allegations in a previous pleading have done so in special circumstances."); *id.* at *6 (finding that such "[s]pecial circumstances exist" because "Plaintiffs' previous allegations . . . directly contradict those in their amended pleadings" and are "implausible and conclusory"). In fact, as Coinbase amply demonstrates (Br. 33-43), courts across the country recognize that there are at least *some* circumstances in which they may appropriately consider factual allegations or other material in a prior complaint notwithstanding plaintiffs' efforts to conceal or contradict those allegations in amended pleadings. Those judges are doing exactly what Rule 12(b)(6) requires: "adjudicat[ing] the precise cases before them, striking the balance as best they can" between liberality in

pleading and "deterring the use of the litigation process as a device for extracting undeserved settlements." *In re Time Warner*, 9 F.3d at 263.

3. The various other district court authorities referenced by Plaintiffs and their *amici* are insufficient to deter the kind of gamesmanship the district court perceived in this case. The dismissal tool is therefore critical to avoid imposing senseless costs on defendants, the courts, and the country.

First, the fact that a superseded complaint containing contradictory allegations may be considered as evidence at the fact-finding stage does nothing to address the wasted time and expense of discovery needed to reach that stage. As a result, it likewise does not mitigate the *in terrorem* settlement dynamics at play.

Second, for similar reasons, a district court's discretion to convert a motion to dismiss into a motion for summary judgment to consider matters outside the pleadings, *see* Fed. R. Civ. P. 12(d), does not solve the problem. A "real and significant result of [Rule] 12(d) is the opportunity for discovery," because treating a motion to dismiss "as a summary judgment motion under Rule 56 would enable the nonmovant" to invoke Rule 56(d). Geary, 89 U. Chi. L. Rev. at 1017. Under that Rule, a court may deny summary judgment without prejudice if there has not been "adequate time for discovery." *Celotex*

*Corp.* v. *Catrett*, 477 U.S. 317, 322 (1987); *see Convertino* v. *U.S. Dep't of Just.*, 684 F.3d 93, 99 (D.C. Cir. 2012) ("A Rule 56([d]) motion requesting time for additional discovery should be granted almost as a matter of course unless the non-moving party has not diligently pursued discovery of the evidence."). Because "'adequate time' usually means 'adequate discovery,' . . . defendants cannot escape even completely frivolous suits until after they have expended substantial sums of money responding to plaintiff's discovery requests." Stancil, 61 Baylor L. Rev. at 108.

Third, it is also no answer that a court may deny leave to amend if it suspects that the amendment is an improper stratagem to prevent dismissal. That option was not available in this case, nor will it be any time a plaintiff seeks to avoid certain dismissal by amending the complaint as of right within 21 days of a motion to dismiss, *see* Fed. R. Civ. P. 15(a)(1)(B).

Finally, the specter of Rule 11 sanctions is not enough to deter the sort of gamesmanship the district court thought occurred here. Simply put, Rule 11 "just doesn't work" in that way. Stancil, 61 Baylor L. Rev. at 104. "Reported cases involving Rule 11 sanctions of any type are surprisingly rare," and "reported cases in which the sanction for frivolous pleading includes the defendant's discovery costs are virtually nonexistent." *Id.* Even if courts were

willing to order reimbursement of millions in discovery costs, moreover, "even a well-financed plaintiff's attorney may not be able" to pay it. *Id.* at 105. Moreover, the timing is all wrong: A "court is unlikely to entertain a sanctions motion before adequate time for discovery has passed." *Id.* at 106. And "[f]ew defendants" who settle the case to avoid discovery costs "will want to risk upending the deal by asking for a Rule 11 inquiry." Erickson, 102 Iowa L. Rev. at 105. Instead, "[t]hey may simply be glad the fight is over and may not want to spend more time and money on an uncertain sanctions battle." *Id.*

Again, decades of experience in securities class actions are instructive. In enacting PSLRA, Congress hoped that the threat of sanctions would meaningfully deter strike suits and other meritless litigation. The statute thus requires courts to "conduct a Rule 11 inquiry upon the final adjudication of *every* securities class action." Erickson, 102 Iowa L. Rev. at 104 (citing 15 U.S.C. § 78u-4(c)). Yet as noted above, the PSLRA has barely put a dent in vexatious securities filings. Thus, the threat of sanctions, although a generally helpful tool to deter abuse of the court system, is not enough to change the *in terrorem* calculation in the specific circumstances presented here.

## CONCLUSION

For the foregoing reasons, the Court should affirm the judgment of the district court.  At a minimum, the Court should not disturb the longstanding ability of district courts to consider the allegations of a superseded complaint as they deem necessary to deter clear gamesmanship.

Dated:  August 30, 2023

Respectfully submitted,

/s/ *Judson O. Littleton*

JUDSON O. LITTLETON
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, D.C.  20006-5215
(202) 956-7500
littletonj@sullcrom.com

TYLER S. BADGLEY
KEVIN R. PALMER
U.S. CHAMBER LITIGATION CENTER
1615 H Street N.W.
Washington, D.C. 20062
(202) 463-5747

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, I hereby certify that this brief complies with the type-volume limitation of Second Circuit Rule 29.1(c) because this brief contains 4,725 words, excluding the parts of the brief exempted by Rule 32(f). That approximation is based on the "Word Count" function of the word-processing program used to draft the enclosed brief.

I further certify that this brief complies with the requirements of Federal Rule of Appellate Procedure 32(a) because this brief has been prepared in 14-point font in a proportionally spaced typeface using Microsoft Word 2016.

Dated:     August 30, 2023

/s/ *Judson O. Littleton*
JUDSON O. LITTLETON

## CERTIFICATE OF SERVICE

I hereby certify that on August 30, 2023, a copy of the attached brief was filed electronically with the Clerk of the Court for the U.S. Court of Appeals for the Second Circuit by using the appellate CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:    August 30, 2023

*/s/ Judson O. Littleton*
JUDSON O. LITTLETON